[Cite as *State v. Theodus*, 2012-Ohio-2064.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97290**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# CHRISTOPHER THEODUS

DEFENDANT-APPELLANT

## JUDGMENT:
## REVERSED AND REMANDED IN PART;
## VACATED IN PART

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-546886

**BEFORE:** Sweeney, J., Boyle, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** May 10, 2012

**ATTORNEY FOR APPELLANT**

Michael V. Heffernan, Esq.
75 Public Square, Suite 700
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

William D. Mason, Esq.
Cuyahoga County Prosecutor
By: Scott Zarzycki, Esq.
        Edward Brydle, Esq.
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113

JAMES J. SWEENEY, J.:

{¶1} Defendant-appellant Christopher Theodus ("defendant") appeals his convictions for unlawful sexual conduct with a minor, rape, sexual battery, and gross sexual imposition. After reviewing the facts of the case and pertinent law, we reverse and remand defendant's conviction for forceable gross sexual imposition and vacate defendant's remaining convictions.

{¶2} In September 2010, 15-year-old Y.B. ran away from home for three nights. This case concerns her allegations that on the second night defendant and two of his friends, Kyle Noernberg and John Rivera, took advantage of her sexually when she was drunk.

{¶3} In February 2011, defendant, Kyle, and John were indicted for various sex offenses related to Y.B.'s allegations. On May 26, 2011, a jury found defendant guilty of unlawful sexual conduct with a minor in violation of R.C. 2907.04 as an inferior offense of forceable rape; substantially impaired rape in violation of R.C. 2907.02(A)(1)(c); sexual battery in violation of R.C. 2907.03(A)(2); and two counts of gross sexual imposition in violation of R.C. 2907.05(A)(1) and (5). On August 23, 2011, the court merged all counts and the state elected to proceed to sentencing on the rape conviction. The court sentenced defendant to ten years in prison.

**{¶4}** Defendant appeals and his case is being reviewed in conjunction with his co-defendants' cases, *State v. Noernberg*, 8th Dist. No. 97126 and *State v. Rivera*, 8th Dist. No. 97091. As in the companion cases,[1] we find insufficient evidence to support defendant's convictions for unlawful sexual conduct with a minor, rape, sexual battery, and one count of gross sexual imposition. When reviewing sufficiency of the evidence, an appellate court must determine, "after viewing the evidence in a light most favorable to the prosecution, whether any reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991).

I.  Substantially impaired rape, sexual battery, and gross sexual imposition

**{¶5}** Rape is governed by R.C. 2907.02, and defendant was convicted of subsection (A)(1)(c), which states that

> [n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * *.

**{¶6}** Defendant was convicted of sexual battery in violation of R.C. 2907.03(A)(2), which states that

---

[1]This court may recognize plain error sua sponte to prevent a miscarriage of justice. *State v. Doss,* 8th Dist. No. 88443, 2008-Ohio-449, ¶ 9; *State v. Malone*, 3d Dist. No. 9-06-43, 2007-Ohio-5484, ¶ 33.

[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.

**{¶7}** Defendant was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(5), which states in pertinent part that

[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he ability of the other person to resist or consent * * * is substantially impaired because of a mental or physical condition * * *, and the offender knows or has reasonable cause to believe that the ability to resist or consent of the other person * * * is substantially impaired because of a mental or physical condition * * *.

**{¶8}** All three of these offenses contain the element that the victim was "substantially impaired" at the time of the sexual act and that the defendant knew of the substantial impairment. In *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987), the Ohio Supreme Court held that the state may establish substantial impairment at trial through evidence showing a reduction or decrease in the victim's ability to act or think. Voluntary intoxication can, at times, be a condition that leads to substantial impairment; however, as this court has noted, "'[w]e do not hold that all persons who engage in sexual conduct with a voluntarily intoxicated person are culpable under R.C. 2907.02(A)(1)(c).'" *In re King*, 8th Dist. No. 79830, 2002-Ohio-2313, ¶ 22 (quoting *State v. Martin*, 12th Dist. No. CA99-09-026, 2000 WL 114465 (Aug. 14, 2000)).

[W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when

reviewing whether a defendant knew, or should have known, that someone was impaired rather than merely intoxicated.

*State v. Doss*, 8th Dist. No. 88443, 2008-Ohio-449, ¶ 18.

{¶9} Furthermore, R.C. 2901.22(B) defines "knowledge" as follows:

A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

A. Trial testimony

{¶10} In the instant case, the following testimony was presented at trial:

{¶11} Y.B. testified that one night in September 2010, she snuck out of the house to drive around with her boyfriend. Y.B. felt that she could not go back home because she was still in trouble for having run away in August 2010. Y.B. was dropped off at Ray's, a man she met while visiting her aunt. Y.B. spent the night and next day at Ray's, then she called Terrance, a man she had never met but recently became "friends" with on the social networking website Facebook.

{¶12} Y.B. met up with Terrance and two of his friends, John and Darrius. Y.B., Terrance, John, and Darrius went to Kyle's house, where they were joined by defendant. Y.B. did not know what she was going to do when she got to Kyle's house, but she did not express discomfort in going to a house where she did not know anybody.

{¶13} Y.B., John, Kyle, and defendant went to Giant Eagle to buy alcohol, which defendant purchased. According to Y.B., she told the others her age. When they returned from Giant Eagle, Terrance was no longer at the house.

{¶14} At Kyle's house the group began drinking beer and smoking marijuana. According to Y.B., this was the first time she had ever drank alcohol, but she had smoked marijuana on many prior occasions and had experimented with other drugs. Y.B. testified that in 2010, she went to an outpatient drug treatment program for four weeks.

{¶15} According to Y.B., she drank "more than five" large cans of beer. She recalled this "because they all left their alcohol and gave it to me. They all gave me their alcohol because they were trying to get me drunk." Y.B. testified that when she was at Kyle's house drinking, smoking marijuana, and socializing, she did not feel uncomfortable.

{¶16} Y.B., defendant, Kyle, and John went into Kyle's bedroom. Y.B. was not forced to do this. Y.B. testified that she could have left or called someone, but she chose not to, even though it was "sort of" clear that sexual activity was about to occur. Y.B. testified as follows about what happened next:

> I started feeling dizzy on — like just tired, and didn't really feel that well. I was sitting on the bed, on the edge of the bed, and that's when Kyle, John and [defendant] all came towards me, like got into my face. And I tried to push them away, but it was like — I was too weak to do that. But then John and [defendant] left the room and it was just me and Kyle in there.

{¶17} According to Y.B., she refused to have sexual intercourse with Kyle, but ultimately performed oral sex on him because he told her she would have to leave otherwise. Y.B. testified that "I did [it] because I didn't want to leave." Y.B. "puked all over his penis," and threw up in the bathroom afterwards. Y.B. cleaned herself up and felt "okay," although she was "still a little like sick and* * * dizzy and tired." Y.B. went

back into the bedroom and defendant came in. According to Y.B., Kyle told defendant that "this girl just puked on me * * *."

{¶18} Defendant sat next to Y.B. on the bed and asked her to take her pants off. Y.B. said no. Y.B. testified about what happened next:

> He came and stood in front of me. I was sitting on the bed, my legs hanging off the edge of the bed. * * * He took his pants [off]. And I didn't want to do it at all, but he kept pushing me to do it. And he had one of his hands on the back of my head and kind of like pulled my hair. And the other one was — the other hand was trying to get me to like give him a blow job, put his penis in my mouth. But I did because he started really hurting my head from pulling it.

{¶19} On cross-examination, Y.B. was asked, "[D]id you eventually give in or was [defendant] continuing to be forceful throughout the act?" and Y.B. responded, "I eventually gave in."

{¶20} At this point, Kyle, John, and defendant left the house, and Y.B. was alone with a person named "X." Y.B. watched television with X and fell asleep until Kyle and John came back. According to Y.B., defendant did not return.

{¶21} Y.B. went back into the bedroom with John and Kyle. Y.B. was lying on the floor next to John, who wanted to have sex with her. She said no, and John asked Y.B. to perform oral sex on him. Y.B. testified that "I wouldn't do it and he said that he would have Kyle make me leave. And I told him it was not his house to tell me if I could leave or stay." Y.B. testified that she performed oral sex on John and then they all fell asleep.

{¶22}   Y.B. further testified that after the sexual acts, she "felt really uncomfortable [and] disgusted." Nonetheless, she got into bed with Kyle to sleep although there was an empty couch in the room. Y.B. testified that she never blacked out or lost consciousness. Asked if she knew what was happening as it was happening, Y.B. answered, "Sort of. I mean I was * * * Yeah."

{¶23}   When she woke up, Y.B. went to the library with Kyle, John, and X. They all used the computers and Y.B. checked her Facebook account. Y.B. testified that "I didn't really like remember much of what happened the night before. All I remembered is me being there." However, "later on the next morning," Y.B. began to remember the events. From the library, she and Kyle went to a party at Julian's house, where Y.B. drank alcohol and eventually spent the night. The next day, Y.B. continued to spend time with this group of males until Terrance and Darrius dropped her off at a McDonald's where she met her cousin and her uncle. Y.B.'s cousin and uncle were worried about her and trying to calm her down. Y.B. was crying "[b]ecause I felt really sad for doing what I did and for what happened." Y.B. was taken to her aunt's house where the rest of her family, as well as the police, were waiting for her.

{¶24}   Y.B. testified that she was "really scared and so nervous" when she got there.

> I was scared they would find out what happened. Because like — I didn't want them to know that I'd done what I've done with these guys and — I didn't want them to know. Because like for me in my culture, that's more shameful than running away. Doing that kind of — like oral sex, sex, any of that, it's much more shameful than running away. So I wasn't worried

much about the running away as much as I was about them finding out what happened during the time.

{¶25} Y.B. testified that when she saw her family and the police, she ran out the door. A police officer chased her down and she was transported to the hospital, where she was admitted to the psychiatric unit. Y.B. told a nurse that she "may have been" sexually assaulted. A rape kit was ordered but Y.B. refused because she "didn't want anyone to find out." She also refused to speak with the two police officers who came to the hospital.

{¶26} Later that day, Y.B. agreed to speak with Brooklyn Police Detective Cindy Eschweiler. Y.B. told the detective that she was "okay with everything that happened," and that she consented to the oral sex with defendant, Kyle, and John. However, during the trial Y.B. testified that she "didn't really tell [the detective] the truth about it" initially. Asked to explain this inconsistency, Y.B. testified as follows:

> I was kind of scared and I didn't want to like make it into this big whole deal, and didn't want anyone to know what happened to me. Because like for me, my family, now they — for me it's kind of a really bad thing. It's a really shameful thing. And I didn't want that to happen. But the rest of my family found out about it because my cousins were — asked questions and they found out and now they look at me like I've done something wrong. And it's a shameful thing.

{¶27} Y.B. testified that she was concerned about how this situation would look to her family. "* * * I didn't really know that Detective Eschweiler was going to notify them that I did it because I was okay with it." Asked whether her parents would have felt the same whether she consented or was forced to have sex, Y.B. replied, "I'm not sure."

**{¶28}** Approximately one month later, in mid-October 2010, Y.B. contacted Det. Eschweiler and told her "there's more to it." Asked why she decided to talk, Y.B. replied,

> I — people talked to me and they told me, you know, if you don't do something, they think they got away with it this time, but the next time they might do it again and get away with it and just keep doing it until someone really does something about it.

**{¶29}** Y.B. spoke with the detective again in December, and a statement was written up, which defendant signed.

**{¶30}** Dr. Robin Finkenthal, a psychologist for the Parma City School District who has been involved with Y.B. since she was in the fifth grade, testified that Y.B. suffered from severe attention deficit, hyperactivity disorder (ADHD), low-average to average intelligence, borderline personality disorder, and substance abuse. Dr. Finkenthal testified that the "hallmarks" of ADHD and borderline personality disorder are

> being impulsive, being inattentive, even though you may be listening to directions, you're not really processing or hearing them, making decisions without considering consequences. * * * [T]he centrality of [borderline personality disorder] is difficulty getting along with other people in her personal relationships. A lot of drama, a lot of getting into situations which, you know, risk taking, need for attention, low self-esteem.

**{¶31}** According to Dr. Finkenthal, Y.B.'s symptoms would not be "readily recognizable" to, or could be missed by, a lay person who came in contact with Y.B.

**{¶32}** Charlene Nauman, a sexual assault nurse examiner at Fairview Hospital, testified that she spoke with and examined Y.B. in September 2010, when Y.B. was hospitalized after running away. Y.B.

was concerned that * * * somebody may have had sex with her, with her not knowing about it. * * * She wanted to determine if she was a virgin or not. * * * During our conversation she did remember that she did have oral sex.

{¶33} Nauman told Y.B. that she could physically examine her for injury, but she would not be able to tell if Y.B. was a virgin. Y.B. refused to have the physical examination.

{¶34} Xavier Gordon testified that he met Y.B. at Kyle's house one night when people were there "drinking and hanging out." According to Xavier, who also goes by the nickname "X," Y.B. seemed "really comfortable" for having just met everyone.

{¶35} Terrance Lee testified that he knew Y.B. through Facebook, and one night in September 2010, she called him and asked if she could hang out with him. A group of people were at Kyle's and Y.B. joined them. This was the first time that Terrance and Y.B. met face-to-face. They were smoking marijuana and eventually decided to buy beer. Defendant, Kyle, John, and Y.B. went to get the beer. Terrance left the house before they got back.

{¶36} According to Terrance, when they were at Kyle's, Y.B. "was pretty comfortable, talking to all of us, asking us questions, trying to get to know us." Terrance got the impression that this was not the first time Y.B. had drank alcohol.

> [S]he seemed like she knew what she was doing. She was handling it real well, meaning it didn't cross my mind that she was a beginner or a lightweight. She seemed like she had partied before and everything was fine.

**{¶37}** Terrance did not go back to Kyle's until the next day. Terrance, Kyle, and Gordon walked to the library. Y.B. was there with Julian. Terrance went to a party at Julian's that night with John and Y.B., who got "pretty intoxicated" and spent the night at Julian's.

**{¶38}** Terrance received a call the next day from a male who said, "[W]e want our daughter, she's a runaway, we would like our daughter." Terrance and Darrius walked Y.B. to a nearby McDonald's.

> And then that's when I finally tell her, you know, your people are here to come get you. And then she started freaking out in the McDonald's, she starts hyperventilating, having a hard time breathing. She was scared. * * * So whoever it was that gets there, * * * they pull her into the car. And as me and Darrius are walking we heard her screaming, Terrance, Darrius, help me, I don't want to go with them * * *. Just causing a big scene in McDonald's parking lot.

**{¶39}** Brooklyn Police Detective Cindy Eschweiler testified that she was assigned Y.B.'s case on September 17, 2010. Limited information was available because Y.B. had refused to speak with the police. Det. Eschweiler went to see Y.B., who "was being held in the psychiatric pediatric unit," thinking that Y.B. might be more responsive to a female police officer. Y.B. initially refused to meet with Det. Eschweiler, then changed her mind. Y.B. was reluctant to talk and gave the detective no information other than expressing a concern "about whether or not she was a virgin." Later in the converstion Y.B. stated that she "had oral sex with multiple males."

**{¶40}** Det. Eschweiler spoke with Y.B. again on October 14, 2010, when Y.B. called her from the school guidance counselor's office. Y.B. told the detective that she

wished to "clarify some things" from their initial conversation because "she didn't tell * * * the truth" at the time. Det. Eschweiler met Y.B. at her school with guidance counselor Pizem present. Y.B. told Det. Eschweiler the location where the incident took place, and the investigation lead to the identification of defendant, Kyle, and John. Det. Eschweiler interviewed Y.B. again in December, and at that time, Y.B. signed a statement about the incident.

{¶41} Det. Eschweiler testified that Y.B.'s parents were initially uncooperative in the investigation. According to Det. Eschweiler, this was "unusual," however, she noted there were "cultural issues" that had to be dealt with.

{¶42} According to Det. Eschweiler, Y.B. told her the following:

> She said that she wasn't sure if she was vaginally assaulted. Again, she told me that she remembers the oral sex, but she did not recall — she didn't know if she was vaginally sexually assaulted.

{¶43} Asked if Y.B. indicated that the oral sex was consensual, the detective testified, "She did indicate that it was consensual at that time." Det. Eschweiler testified that Y.B. "absolutely" did not seem "bothered by the prospect that she had performed consensual oral sex on multiple males."

{¶44} Det. Eschweiler also testified that Y.B. specifically recalled having four drinks on the night in question, and Y.B. was surprised at her level of intoxication because of her past experiences drinking.

B. Analysis

{¶45} Upon review of the trial testimony in the case at hand, we find insufficient evidence to show that Y.B. was substantially impaired rather than merely intoxicated. Y.B. vividly recalled the events of the night at Kyle's, including how much she drank and the details of each of the three sexual encounters. She exercised her ability to consent by refusing to have vaginal intercourse with each of the three defendants, because she allegedly wished to remain a virgin. Eventually she "gave in" to oral sex with Kyle and John because she did not want to leave and she "gave in" to oral sex with defendant because he kept "pushing" for it. Although there is evidence that Y.B. vomitted, we find this insufficient to show that her ability to think or act was substantially impaired. By refusing to consent to one sexual act and then consenting to another sexual act, Y.B. showed that her ability to reason — and more specifically, her ability to consent — was intact.

{¶46} We additionally find insufficient evidence to show that defendant knew, or should have known, that Y.B.'s level of intoxication was allegedly to the point that she was substantially impaired. According to Y.B., she had a conversation with defendant prior the incident, and there is no evidence that her speech was slurred or otherwise impaired. Terrance and Xavier, who observed Y.B. drinking that night at Kyle's, testified that Y.B. seemed "really comfortable," and neither recollected anything unusual about her intoxication level. In fact, Terrance testified that "[s]he seemed like she had partied before and everything was fine."        In *In re King*, 8th Dist. No. 79830,

2002-Ohio-2313, this court affirmed the trial court's finding a juvenile offender delinquent of sex offenses involving a substantially impaired victim.

> We * * * hold the victim in this case *could not have consented* to what occurred. Furthermore, [the offenders] were aware of her inability to consent because of her intoxicated state. Here her voluntary intoxication does not control the outcome of the case. The outcome of the case is controlled by her lack of consent and to what extent the alcohol impaired her ability to give consent.

*Id.* at ¶ 24 (emphasis added).

**{¶47}** This court used similar reasoning but reached a different conclusion in *State v. Schmidt*, 8th Dist. No. 88772, 2007-Ohio-4439. The *Schmidt* court reversed the defendant's sexual battery conviction for insufficient evidence that the defendant had knowledge of the victim's alleged substantial impairment. In *Schmidt*, the victim recalled details of the night in question, such as acting "normally" and parallel parking her car. Additionally, she *remembered consenting* to various sexual acts, but claimed that the vaginal intercourse occurred without her consent. *Id.* at ¶ 28 (emphasis added). This court held that "[t]here is nothing in this record that would enable a trier of fact to reasonably conclude that defendant was aware that [the victim] was substantially impaired to the point that it affected her ability to control * * * her conduct." *Id.* at ¶ 46.

**{¶48}** Taking into consideration the facts and legal reasoning in *In re King* and *Schmidt*, we hold in the instant case that the state failed to present sufficient evidence that Y.B. was substantially impaired or that defendant knew or should have known this. Thus, there is insufficient evidence to sustain defendant's convictions for rape, sexual

battery, and one count of gross sexual imposition. We are aware that the facts of this case are sensitive, and we do not condone defendant's behavior. However, we are bound to follow the law objectively and apply it justly.

II. Unlawful sexual conduct with a minor

{¶49} Unlawful sexual conduct with a minor is governed by R.C. 2907.04, which states in pertinent part that

> [n]o person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard.

{¶50} In *State v. Wright*, 8th Dist. No. 93068, 2011-Ohio-3575, this court vacated Wright's convictions for unlawful sexual conduct with a minor because the state did not present sufficient evidence of the defendant's age, which is an essential element of the offense. In following *Wright's* holding, we find that the state failed to present any evidence whatsoever of defendant's age in the instant case. "When age is an essential element of an offense, it must be proved beyond a reasonable doubt." *Id.* at ¶26 (citing *State v. Price*, 80 Ohio App.3d 35, 43, 608 N.E.2d 818 (1992)).

{¶51} Additionally, upon review, we find that the court failed to properly instruct the jury regarding evidence of defendant's age. "As a general rule, a defendant is entitled to have the jury instructed on all elements that must be proved to establish the crime with which he is charged." *State v. Adams*, 62 Ohio St.2d 151, 153, 404 N.E.2d 144 (1980). In the instant case, the court instructed the jury as follows:

Unlawful sexual [conduct] with a minor is having sexual conduct with another who was not his spouse and the defendants knew that she was 13 * * * years of age or older, but less than 16 years of age, or the defendant was reckless in this regard.

{¶52}   Accordingly, there is insufficient evidence in the record to sustain defendant's conviction for unlawful sexual conduct with a minor and the court's judgment on this count is vacated.

III.   Forceable gross sexual imposition

{¶53}   Defendant's remaining conviction is for gross sexual imposition in violation of R.C. 2907.05(A)(1), which states in pertinent part that

[n]o person shall have sexual contact with another, not the spouse of the offender * * * when * * * [t]he offender purposely compels the other person * * * to submit by force or threat of force * * *.

{¶54}   Defendant argues that his conviction on this count is against the manifest weight of the evidence and that the jury lost its way in convicting him.

{¶55}   The proper test for an appellate court reviewing a manifest weight of the evidence claim is as follows:

The appellate court sits as the "thirteenth juror" and, reviewing the entire record, weighs all the reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Determinations of witness credibility are primarily left to the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 541 (1967).

{¶56} In the instant case, Y.B. testified that defendant pushed her head while trying to convince her to engage in oral sex, but that ultimately she consented and "gave in." The totality of the circumstances in the case at hand gives rise to the inference that defendant did not "purposely compel" Y.B. to "submit by force or threat of force." Y.B. ran away from home and voluntarily joined defendant and his friends, none of whom she knew, where she voluntarily drank alcohol and smoked marijuana. Y.B. voluntarily engaged in oral sex with defendant and two of his friends after refusing to have vaginal intercourse with all three of them. Although there is evidence that defendant pushed Y.B.'s head, the greater weight of the evidence shows that Y.B. consented to the act. Under the unique facts of the case at hand, we find that the jury lost its way in convicting defendant of forcible gross sexual imposition.

{¶57} Defendant's first assignment of error is sustained as it relates to his conviction for gross sexual imposition in violation of R.C. 2907.05(A)(1).

{¶58} Defendant's second, third, and fourth assignments of error are rendered moot by the foregoing disposition and App.R. 12(A)(1)(c).

{¶59} Judgment reversed. Defendant's convictions for unlawful sexual conduct with a minor, rape, sexual battery and gross sexual imposition in violation of R.C. 2907.05(A)(5) are vacated based on insufficient evidence; this matter is remanded with instructions to the trial court to enter judgment vacating these convictions, the accompanying prison sentences, and defendant's classification as a Tier III sex offender. Defendant's conviction for gross sexual imposition in violation of R.C. 2907.05(A)(1) is

reversed as it is against the manifest weight of the evidence, and his accompanying sentence is vacated; this case is remanded to the trial court for proceedings consistent with this opinion.

It is, therefore, considered that said appellant recover of said appellee his costs herein.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

JAMES J. SWEENEY, JUDGE

MARY J. BOYLE, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR