[Cite as *In re K.S.*, 2014-Ohio-188.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF:

K.S.

JUDGES:
Hon. William B. Hoffman, P.J.
Hon. Sheila G. Farmer, J.
Hon. Patricia A. Delaney, J.

Case No. 13-CA-21


O P I N I O N


| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Fairfield County Court of Common Pleas, Juvenile Division, Case No. DL20120317 |
| JUDGMENT: | Reversed and Remanded |
| DATE OF JUDGMENT ENTRY: | January 13, 2014 |

APPEARANCES:

For Appellee

GREGG MARX
Proseucting Attorney

By: ZOE A. LAMBERSON
Assistant Prosecuting Attorney
Fairfield County, Ohio
239 W. Main St., Ste. 101
Lancaster, OH 43130

For Appellant

SCOTT P. WOOD
Dagger, Johnston, Miller,
Ogilive & Hampson
144 East Main St.
P.O. Box 667
Lancaster, OH 43130

*Hoffman, P.J.*

{¶1}   Appellant K.S. appeals his adjudication as a juvenile delinquent on February 6, 2013 via Judgment Entry entered by the Fairfield County Court of Common Pleas, Juvenile Division, adjudicating him delinquent by committing rape.  Appellee is the state of Ohio.

### STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

{¶2}   The following facts are adduced from a bench trial before the juvenile court.  At the time of these events, Appellant was age 17 and a high-school junior; H.T., the alleged victim, was 16 and a high-school sophomore.  Both attended the same school.  H.T. testified she saw Appellant around school and "liked" him; the two began texting each other but had little or no contact at school.  The two communicated through texts and social media.

{¶3}   The adjudicatory hearing consisted of the testimony of H.T., Officer Daniel Thomas, and Detective Eric Duemmel of the Lancaster Police Department.

### The Testimony of H.T.

{¶4}   On April 1, 2012, H.T. was with her mother at her mother's workplace when Appellant stopped by in his truck, a Ford Ranger pickup.  H.T. and Appellant talked for a while in the parking lot and Appellant said he needed to get gas.  The two drove to a gas station and then stopped in a mall parking lot near a closed store.  H.T. testified no one was around.

{¶5}   Appellant said he was bored and asked H.T. what they should do while they were sitting in the truck.  He "scooted" closer and the two kissed several times.  Appellant placed his hand near H.T.'s crotch area and she said she was on her period

even though she wasn't. He said it was "O.K." Appellant then took her hand and put it on his penis; she pulled away; he did it again and she left it there.

{¶6} Appellant was wearing pajama bottoms. H.T. denied unbuttoning Appellant's pants. Appellant took "it" out of his pants, grabbed her neck, pushed her face near his penis, and "it struck [her] in the forehead." H.T. stated she knew what Appellant wanted, and she did proceed to engage in oral sex, which did not go on for very long. She said he then pushed her by her shoulders to lie down. Appellant got out of the truck. H.T. sat up but Appellant told her to lie back down. Her head now lay over the seat; Appellant stood in front of her, inside the open truck door, and told her to put her mouth on his penis. He "finished" in her mouth, she spit in the parking lot, and he got back into the truck.

{¶7} H.T. stated she did not want to have oral sex with Appellant but felt she had "no choice." She said if he hadn't put his hand on the back of her head, she would not have performed oral sex. She did not try to get out of the truck because she was afraid he would try to run her over. She stated, "Um, I mean, I didn't really know what was going on, so I just kind of went with everything."

{¶8} H.T. said there was no discussion of the oral sex. She did not say "stop" or "no" when Appellant placed his hand on her head. He did not make any threats. She found it to be "clear" what he wanted.

{¶9} After the incident, Appellant got back into the truck and took H.T. back to her mother's office. H.T. denied she asked him how soon he would text her. She hugged him and he left. She didn't tell her mother or anyone else what happened for several days.

{¶10} H.T. told her friend M.S. about the incident several days later. M.S. told her Appellant had raped her older sister. H.T. was also aware of another female who had a problem with Appellant.

{¶11} H.T.'s father reported the incident to law enforcement on April 7, 2012. She was upset with her dad for going to the police.

{¶12} H.T. testified she received a text from Appellant around 3:00 a.m. on the night of the incident, which upset her because she felt he had "used" her. He told her never to talk to him again, to delete his phone number, and he didn't like her. H.T. said this made her upset; she was mad at Appellant and she is still mad at him.

{¶13} On cross examination, H.T. was asked, you claimed you didn't have a choice and yet you never said no; how would Appellant have known you didn't want to have oral sex with him? She replied, "Because I said I was on my period."

## The Testimony of Officer Thomas

{¶14} H.T.'s father reported the incident to Officer Daniel Thomas of the Lancaster Police Department on April 7, 2012 as a sexual assault. Thomas did not speak with H.T.; his role was limited to taking a report, forwarding it to the detective bureau, and placing the sweatshirt H.T. had been wearing into evidence.

## The Testimony of Det. Duemmel

{¶15} Detective Eric Duemmel of the Lancaster Police Department conducts the majority of the department's child sexual assault investigations. He testified he is trained in interview and interrogation techniques, including "kinesic interviewing techniques," which involve reading a suspect's body language and eye movements to look for indicators of deception.

**{¶16}** Duemmel testified he did not personally interview H.T.; instead, he arranged for her to be interviewed by the Child Advocacy Center ("CAC") and watched her interview on camera in real time from several rooms away. Regarding H.T.'s interview, Appellee asked, "Based on your kinesic training, did you see any signs of deception?" Appellant objected and the trial court overruled the objection. Duemmel stated he saw no signs of deception during H.T.'s interview but he did not interview her personally, which he stated is "standard practice" once a victim has been interviewed by the children's services agency.

**{¶17}** Duemmel also conducted a recorded interview with Appellant. The tape of this interview was played during Duemmel's testimony and is therefore preserved in the record.

**Appellant's Recorded Statement to Police**

**{¶18}** On April 1, 2012, Appellant had called off work and was home sick, sleeping late. Thus, he was wearing pajama pants when he stopped at H.T.'s mom's office to see H.T. She came out to talk to him in the parking lot and when he said he needed to get gas, she said she would come along. The pair got gas and then stopped in a parking lot at the mall.

**{¶19}** Duemmel asked how the conversation proceeded from small talk to sex. Appellant said this was the first time the two had ever met outside of school. They had talked about sex in their text messages, discussing "hooking up" and their respective sexual histories in previous relationships.

**{¶20}** The pair was discussing "going all the way" and at what point they had done so in previous relationships. They started kissing. Appellant stated he was

wearing pajama pants with one button; he admitted he placed H.T's hand on his penis. He said he unbuttoned his pants and H.T. started giving him a "hand job" for several minutes. When it became apparent it "wasn't going anywhere," he asked her if she wanted to give him a "blow job." Despite her initial reluctance, she eventually agreed.

{¶21} Appellant stated the oral sex began while he was sitting in the driver's seat; he put up the center console and H.T. laid across the seat with her head near the steering wheel. Duemmel asked Appellant where his hands were, and Appellant answered on the window and holding back the center console. Appellant stated they changed position because he "didn't want to get 'it' on [himself], " so he exited the truck and came around to the passenger side. He stood outside the truck with the door open. H.T. sat up and laid back down facing the other way, with her head toward him, and resumed oral sex. Appellant stated she was on her stomach with her head out the passenger-side door. Appellant stated he "finished," H.T. wiped her mouth off, and sat up. He then got back in the driver's side of the truck.

{¶22} Duemmel asked Appellant several times during the interview whether he ever placed his hand or hands on the back of H.T.'s head and Appellant said no. Appellant said H.T. never said "no" or indicated she was unwilling to engage in oral sex. He denied pressuring her to have intercourse. They had specifically discussed "boundaries" and talked about the fact they had both "gone all the way" too soon with other people and it hadn't worked out.

{¶23} Duemmel asked Appellant why H.T. would claim Appellant forced her and he responded she was mad because he stopped texting her several days later.

**{¶24}** H.T. told Appellant she needed to get back, and they returned to her mom's office. He said she "made him" get out of the truck and give her a hug, and told him to text her when he got home. He did text her upon arriving home and she said "great."

**{¶25}** Appellant said the pair texted on and off for a few more days, before he became aware she was "spreading their business" around school, after which Appellant stopped speaking to H.T.

**{¶26}** Appellant described his truck as a 2002 Ford Ranger pickup truck with a bench seat and a center console.

**{¶27}** Thereupon the tape of the interview of Appellant concluded.

### Appellant is Charged with Delinquency by Rape

**{¶28}** Appellant was charged by juvenile complaint with one count of delinquency by means of rape pursuant to R.C. 2907.02(A)(2) and R.C. 2152.02(F), a felony of the first degree. Appellant denied the charge and the case proceeded to bench trial on February 1 and February 6, 2013 before the judge of the Fairfield County Court of Common Pleas, Juvenile Division.

**{¶29}** At the conclusion of the trial, the court made the following finding on the record:

**{¶30}** "All right. Well, I'm ready to give the Court's decision. Um, the interesting part about this case and the evidence in my opinion is that, you know, basically ninety percent of both sides, the facts were the same. Uh, the, it really boiled down to whether or not there was force and threat of force, uh, on the part of [Appellant] and the Court finds that, uh, the testimony of [H.T.] was believable and the statement by [Appellant]

was not and therefore, the Court does make a finding of delinquency based on the count of rape, a first degree felony as it would apply to an adult and, um, we will proceed from there."

{¶31} The trial court thereupon found Appellant to be a Tier III sex offender, and imposed an indefinite term of commitment until age 21, suspended upon a number of conditions including, among others, his successful completion of intensive probation and a sex offender evaluation.

{¶32} Appellant now appeals the trial court's Entry of February 6, 2013 adjudicating him delinquent by means of rape.

{¶33} Appellant raises two assignments of error:

{¶34} "I. THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDING OF DELINQUENCY BASED ON RAPE."

{¶35} "II. THE TRIAL COURT MADE AN EVIDENTIARY RULING DURING TRIAL THAT WAS UNDULY PREJUDICIAL TO APPELLANT."

I.

{¶36} In the first assignment of error, Appellant asserts his adjudication on one count of rape, in violation of R.C. 2907.02(A)(2) is not supported by the sufficiency of the evidence. We disagree.

{¶37} When reviewing the sufficiency of the evidence in a juvenile case, we apply the same standard of review applicable to criminal convictions. *In re Watson*, 47 Ohio St.3d 86, 91, 548 N.E.2d 210 (1989). The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court

held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶38} In reviewing the legal sufficiency of the evidence to support a verdict by the trier of fact, it is the mind of the trier of fact, rather than the reviewing court, that must be convinced. *State v. Thomas*, 70 Ohio St.2d 79, 434 N.E.2d 1356 (1982). In applying this standard of review, the question of credibility of conflicting testimony and the weight to be accorded certain evidence are matters left primarily to the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶39} A reviewing court should not disturb the decision below unless it finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Jenks*, supra, 61 Ohio St.3d at 273.

{¶40} Appellant was found delinquent by rape pursuant to R.C. 2907.02(A)(2), which reads, "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force. "

{¶41} "Force" means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. R.C. 2901.01(A)(1). Force or the threat of force "can be inferred from the circumstances surrounding sexual conduct." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661(1992), at paragraph one of the syllabus. In order to make a finding of force under R.C. 2907.02, "some amount of force

must be proven beyond that force inherent in the crime itself." *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N.E.2d 763 (1998). The Ohio Supreme Court has explained the force necessary to commit rape depends upon the respective age, size, and strength of the parties and their relation to each other. *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988). "Thus, the context of the rape will also affect our inferences regarding the additional element of force or threats of force." *State v. Kaufman,* 187 Ohio App.3d 50, 71, 2010-Ohio-1536, 931 N.E.2d 143 (7th Dist.)

**{¶42}** Upon review of the evidence presented at the adjudicatory hearing, we find, when viewed in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. The testimony presented at the hearing by H.T. alleges Appellant took his penis out of his pants, placed his hand on the back of H.T.'s head and pushed her head near his penis. H.T. testified she did not want to engage in oral sex with Appellant, but felt she had no choice. H.T. testified Appellant used "enough force" to push her head down towards his penis. She further testified she felt she had no choice but to engage in the act of oral sex.

**{¶43}** Appellant's first assigned error is overruled.

II.

**{¶44}** In the second assignment of error, Appellant contends the trial court admitted prejudicial evidence in allowing Detective Duemmel to testify as to the "kinesic interview technique," and his resulting opinions as to the credibility and truthfulness of H.T. and Appellant. We agree.

**{¶45}** At the adjudication hearing on February 1, 2013, Detective Duemmel testified as to his training in "kinesic interviewing," and his perception as to H.T.'s CAC interview, which he watched in real time via video:

**{¶46}** "Q. Okay. Um, and you said something about, was it kinesic?

**{¶47}** "A. Kinesic interviewing, yes.

**{¶48}** "Q. Can you explain what kind of training that is?

**{¶49}** "A. Yes, um, kinesic interviewing deals specifically with reading body language, um, eye movements, um, the way the body moves when people are, are speaking and signs that they give, uh, when, that indicate that they might be deceptive.

**{¶50}** "Q. And how is that useful in your work?

**{¶51}** "A. Um, when we're interviewing suspects, it's a good way just to get an overall gist of their story and how it flows and what signs they're giving off while they're telling that story.

**{¶52}** "Q. Do you use, um, do you use those techniques in all the interviews you conduct?

**{¶53}** "A. Yes, I do.

**{¶54}** "* * *

**{¶55}** "Q. And did you do that for H.T. in this case?

**{¶56}** "A. Yes, I did.

**{¶57}** "Q. (Inaudible) are you familiar with a person by the name of H.T.?

**{¶58}** "A. Yes, ma'am, I am.

**{¶59}** "Q. And were you involved with an investigation of a sexual assault alleged by H.T.?

**{¶60}** "A. Yes, I am.

**{¶61}** "Q. Did you, uh, do you observe the CAC videos when you are involved with that case?

**{¶62}** "A. Yep.  Uh, yes, I do.

**{¶63}** "Q. Okay.  Is that like in real time, are you watching them, how do you observe them?

**{¶64}** "A. Whenever possible, I watch them in real time.  It's, uh, there's a separate room, it's two rooms away from the interview room, and there's a video feed that allows me to watch it on a TV.  It's mounted on the wall.

**{¶65}** "Q. Okay, Um, now, when you watch those, um, do you (pause) you talked about using that kinesic training in, um, like when investigating, when speaking with suspects.  Do you ever apply that training to watching witness interviews and things like that?

**{¶66}** "A. Yes, I do.

**{¶67}** "Q. Okay.  And, um, did you watch H.T.'s CAC interview?

**{¶68}** "A. Yes, I did.

**{¶69}** "Q. Did you watch it in real time?

**{¶70}** "A. Yes, I did.

**{¶71}** "Q. Okay.  And did you see any, based on your experience with kinesic training, did you see any indications of deception during her interview?[1]

**{¶72}** "* * *

---

[1] Appellant's counsel objected to the testimony of Detective Duemmel regarding his kinesic interviewing techniques and application thereof based upon lack of scientific foundation and the witness' ability to determine whether an individual was truthful.  The trial court overruled the objection.

{¶73} "Q. Let me back track actually. What are some signs of deception that you commonly see or you're trained to look for?

{¶74} "A. Um, some of the signs are when someone is talking, they'll self-groom. Um, so they'll play with their hair; they'll try to wipe stuff off their clothes. Another is they obviously, they won't make eye contact. Um, through the kinesic interviewing, we're also taught to, um, when applicable which really wouldn't have been in a viewed interview where you're watching a TV, but you can see eye direction. Um, the way people answer questions on a baseline and then you use that baseline as you ask different questions, you can watch their eye movement and you can see how their eyes move and that tells you, can indicate to you which part of the brain, um, that they're using to formulate their answer. Um, some things like covering their mouth when they're talking. Um, I mean, those are just a few of the, the most common, um, signs that we look for.

**{¶75} "Q. Okay. Um, and then going back now to the original question, when watching H.T.'s CAC interview, did you observe any of these indicators of deception?**

**{¶76} "A. No. I did not."**

{¶77} Tr. at 106; 108-109;110-111. (Emphasis added.)

{¶78} Detective Duemmel then testified as to his interview with Appellant, and his application of his kinesic interview training during the interview:

{¶79} "Q. Um, (pause) after H.T. was interviewed at the CAC, um, what steps did you take after that?

{¶80} "A. I ended up making contact with K.S. to speak with him.

**{¶81}** "Q. And is that K.S.?

**{¶82}** "A. Yes, it is.

**{¶83}** "Q. Okay.  And why did you make contact with K.S.?

**{¶84}** "A. Because she indicated, um, that he was the one that was involved in this case.

**{¶85}** "* * *

**{¶86}** "Q. Um, okay, well I want to go back, obviously, to a little bit about this. (Inaudible)

**{¶87}** "A. Kinesic interviewing?

**{¶88}** "Q. Kinesic, right.  Um, and is this more of the contact that you were referring to when you said you utilized that investigative tool?

**{¶89}** "A. Yes.

**{¶90}** "Q. Okay.  And did you use that in this interview?

**{¶91}** "A. Um, I didn't use that exact technique, to do the eyes, but I did do the body language reading.

**{¶92}** "Q. Okay.  And, um, can you go through what you, what you visualized as far as that goes?

**{¶93}** "A. Um, yeah, he didn't have, I mean, he didn't do a lot of tells, um, in using your kinesic interviewing.  Um, he stayed pretty open, um, and facing me, so like I told him in the video, you know, I thought, um, most of this stuff was truthful.  Um, the big tell that I got from him was, um, the extra long pauses when it came to the point of exact interest.  The way he was able to tell the story very thoroughly up to the point of what we were specifically talking about and then he'd have an extra long pause where

he would just wait, wait, what seemed like, as you were watching, just seems like an abnormal amount of time in order to answer the question.

**{¶94}    "Q. Okay.  And again, what did you indicate that that's indicative of?**

**{¶95}    "A. Uh, deception.**

{¶96}    "* * *

{¶97}    "Q. Um, okay, now K.S. said, um, he said that he asked her to give her, to give him a blow job and that she finally agreed, is that right?

{¶98}    "A. I believe that's the gist of what he said, yes.

{¶99}    "Q. Okay.  Um, and then when he said that, he said that's a detail that would make it sound like I forced her, when he was talking about putting her hand on his head?  Or his hand on her head?  Um, do you recall if that was a time when you noticed an indicator of deception?

{¶100}  "A. Um, I did not.

{¶101}  "Q. Okay.  Um, (pause) um, and he also indicated that he texted for three to four days after the incident, um, do you know that if that's true or not?  Did you ever follow up on that?

{¶102}  "A. I don't think I followed up on that.

{¶103}  "Q. Okay.  Um…

{¶104}  (Pause)

{¶105}  "Q. But he and, um, he did acknowledge that he placed her hand on his penis, correct?

{¶106}  "A. Yes.

{¶107} "Q. Um, is it common for people to allege oral sex as a form of rape (inaudible)?

{¶108} "A. Not in my experience.

{¶109} "Q. Okay.

{¶110} (Pause)

{¶111} (Inaudible)

{¶112} **"Q. Okay. Um, just one last thing, I'm just, for a little clarification. When you said that you noticed the deceptive indicators, um, about the main points of interest, can you specify what those points are that you're talking about?**

{¶113} **"A. Yes, it was specifically about how the oral sex started. You know, initially when we first asked, um, how it started, there was a really long pause to give an answer. He couldn't remember how the oral sex started, um, which that would be an indication of deception because most people would be able to recall specifically how something like that started. Um, as we progress, every time we kind to get to how sex started or where her hands and stuff were, again, there's a long pause that would be a deception.** Along with this, you pointed out some of the, um, seems minor, but the inconsistencies in (inaudible) was he getting off work or was he going to town to get medication because he was sick. Uh, some other, you know, **some other things like that that popped up during the course of the interview that indicated that if it had been a truthful story, um, those points would have stayed consistent throughout the whole story from the beginning all the way up to that last time we talked.**

**{¶114}  "Q. And did you notice, um, when, um, viewing H.T.'s CAC, did you notice any inconsistencies in her story?**

**{¶115}  "A. No, hers seemed very, pretty consistent throughout the whole, uh, interview."**

{¶116}  Tr. at 112; 229-230; 238-240. (Emphasis added.)

{¶117}  On cross-examination, Detective Duemmel testified:

{¶118}  "Q. Thank you.  Now, this technique that you've testified about, and I'm sorry, I didn't catch it, is it kinesic?

{¶119}  "A. Kinesic interviewing.

{¶120}  "Q. Can you spell that for me?

{¶121}  "A. K-I-N-E-S-I-C.

{¶122}  "Q. I-C?

{¶123}  "A. I-C.

{¶124}  "Q. I-C?  Okay.

{¶125}  "A. Kinesic.

{¶126}  "Q. All right.  And is there some scientific foundation to this methodology?

{¶127}  "A. I believe there is.

{¶128}  "Q. And do you have that with you?

{¶129}  "A. I do not.

{¶130}  "Q. Okay.  Can you give us the person who conducted this scientific testing behind it?  One person?

{¶131}  "A. I'm sure I could from notes, but I can't off the top of my head.

{¶132} "Q. Okay.  Um, and before we watched that lengthy, uh, interview, you said the things that you look for were self-grooming, eye move, eye movement and cover, covering the mouth while talking, is that correct?

{¶133} "A. That's some of them, yes, sir.

{¶134} "Q. Those were the three things that you mentioned before we watched the interview.

{¶135} "A. Yeah.

{¶136} "Q. And when I was watching that interview, um, did you ever see K.S. self-grooming when he was talking to you?

{¶137} "A. No.

{¶138} "Q. Did you ever see him, uh, with, with, uh, unusual eye contact?

{¶139} "A. Um he did have some pointes where he would look instead of looking at me, he would look down when he was talking to me, like he didn't want to look me directly in the eye.

{¶140} "Q. But from where I was watching, he pretty much looked you right in the face the entire interview, didn't he?

{¶141} "A. For the most part, yes, sir.

{¶142} "Q. Okay.  And did he ever cover his mouth while he was talking?

{¶143} "A. No.

{¶144} "Q. So the three things that you said you look for, you, you, you didn't see those in K.S.'s interview?

{¶145} "A. I believe when I testified earlier, I said those are some of the items that we look for that were most common.  And no, I did not see those in K.S.'s interview.

**{¶146}** "Q. You did not see those.  Thank you.

**{¶147}** "A. Yes, sir.

**{¶148}** "Q. But the one thing that you did mention, the one thing that led you to believe he was being deceptive were these long pauses before his responses?

**{¶149}** "A. That's correct.

**{¶150}** "Q. Is everyone who gives a long pause before a response lying?

**{¶151}** "A. No, not always.

**{¶152}** "Q. No?  Okay.  So that's not a conclusive way to tell if someone is lying, is it?

**{¶153}** "A. Correct.

**{¶154}** "Q. So someone could give a long pause just because they're trying to remember events that occurred days, weeks or months prior, correct?

**{¶155}** "A. Could be true.

**{¶156}** "Q. And that's the only indicator that you picked up on that he was deceptive?

**{¶157}** "A. Along with…

**{¶158}** "Q. The long pause?

**{¶159}** "A. Along with the inconsistencies, um, in some of the details about how he got there and how the sex, the oral sex got started.

**{¶160}** "Q. Well, when you say inconsistencies, you're talking about inconsistent with her statement.

**{¶161}** "A. No, with his.

**{¶162}** "* * *

{¶163}  "Q. You were trying to get him to confess.  Correct?

{¶164}  "A. I was trying to get him to tell me the truth about what happened.

{¶165}  "Q. No, no, you were trying to get him to say something, to tell you something that was consistent with what she told you, correct?

{¶166}  "A. I was trying to get him to tell me the truth about what happened.

{¶167}  "Q. Right.

{¶168}  "A. And if that was consistent with her, then…

{¶169}  "Q. But that was your baseline.  If, if, if he said anything that was inconsistent than what she told you, you told him that's not right?

{¶170}  "A. Correct.

{¶171}  "Q. Okay.  So you used her story as the baseline truth?

{¶172}  "A. Correct.

{¶173}  "Q. You made an assumption that what she was telling was the truth?

{¶174}  "A. Correct.

{¶175}  "Q. And if he told you anything different, you did not accept that as the truth?  Correct?

{¶176}  "A. I pressed him on it.  I think I accepted some of his other, um…

{¶177}  "Q. So this was not a, this was not a neutral interview?

{¶178}  "A. No.

{¶179}  "Q. You wanted him to tell you certain things?

{¶180}  "A. Yes.

**{¶181}** "Q. And if you [sic] didn't tell you certain things, you were going to press him on it?

**{¶182}** "A. Correct."

**{¶183}** Tr. at 244-247; 250-251. (Emphasis added.)

**{¶184}** Pursuant to Evid.R. 402 and Evid.R. 702, expert testimony is admissible whenever it is relevant and can assist the trier of fact. *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 148, 446 N.E.2d 444, 447–448. Even relevant evidence, however, must be excluded if its probative value is outweighed by danger of unfair prejudice, confusion of issues, and it is misleading the jury. Evid.R. 403. Novel expert testimony to assist the trier of fact must also be based upon principles that have been accepted by the scientific community. *State v. Koss* (1990), 49 Ohio St.3d 213, 551 N.E.2d 970. (Battered woman syndrome has gained substantial acceptance to warrant admissibility.) If the subject matter of an expert's opinion is not accepted scientific evidence, an expert opinion is not helpful, for it is based upon an unreliable premise. *State v. McMillan* (1990), 69 Ohio App.3d 36.

**{¶185}** Upon review of the record, we find the trial court erred in allowing the testimony of Detective Duemmel as to his kinesic interview training and application thereof. The "science" of kinesic interviewing was not established by the State to be based upon principles widely accepted in the scientific community. Furthermore, the testimony of Detective Duemmel as to H.T.'s credibility and lack of any indicators of deception as compared to his perception of Appellant as demonstrating indicators of deception and his opinion as to Appellant being untruthful compared to H.T.'s testimony was prejudicial. The testimony of Detective Duemmel should have been excluded.

**{¶186}** Whereas here, the case involves a victim and a defendant with similar versions of most underlying events and force versus consent is the disputed issue, we find the trial court erred in allowing the testimony of the only investigating and interviewing officer as to a non-scientific method of determining credibility and truthfulness. In this case, the trier of fact determined Appellant was not believable and H.T. was believable. We find the improperly admitted testimony prejudicial to Appellant.

**{¶187}** Appellant's second assignment of error is sustained.

**{¶188}** Appellant's adjudication in the Fairfield County Court of Common Pleas, Juvenile Division, is reversed, and the matter remanded to the trial court for further proceedings in accordance with the law and this opinion.

By: Hoffman, P.J.

Delaney, J., concurs in part and dissents in part

Farmer, J., dissents

*Farmer, J., dissents*

{¶189} I respectfully dissent from the majority's view in Assignment of Error II. Detective Duemmel specifically testified he did not observe any indication of deception by H.T. during her interview as opposed to testifying about her truthfulness.  T. at 111. In addition, further on in direct and also on cross-examination, Detective Duemmel testified he did not observe any indication of deception by appellant during his interview except at hesitating when describing the oral sex performed on him.  T. at 246.  In fact, defense counsel took advantage of Detective Duemmel's experience and used the lack of indicators to establish appellant's truthfulness during his police interview.

{¶190} I would find any error to be harmless in that the minimal impact of the testimony did not unduly prejudice appellant.

*Delaney, J., concurs in part and dissents in part*

{¶191} I respectfully dissent from the majority opinion in regards to the disposition of Appellant's first assignment of error.  Upon review of the record, I am unable to conclude appellee presented sufficient evidence of force or threat of force as required pursuant to R.C. 2907.02(A)(2).  I note the following testimony upon direct examination:[2]

> * * * *.  Um, he did take it out of his pants and grabbed my neck and pushed it near his penis and it hit me in the forehead.  And I, I guess I kind of knew what he wanted me to do at that point.  Um, I did give him a blow job and um, it didn't go on for very long. * * * *.

> * * * *.  Um, when he was walking back around [the truck], I sat back up and when he opened the door, he told me to lay back down and I did and, um, my head was laying over the seat and the door was open and he was standing like in front of me.  And he told me to put my mouth on his penis and he finished in my mouth and I spit it out on the parking lot ground and then he got back in the truck.

{¶192} Further, the following conversation took place on direct examination:[3]

> Q.  Now, just to recap, you said you kissed a few times, correct?
>
> A.  Yes.
>
> Q.  Did you want to do that?

---

[2] T. 14.

[3] T. 15-17.

A. Um, yeah.

Q. And did you, you did give him oral sex?

A. Um, hum.

Q. Did you want to do that?

A. No.

Q. Why did you?

A. Because I felt like I had no choice.

Q. If [appellant] had not put his hand on your head, as you testified before, would you have performed oral sex on him?

A. No.

(Pause)

Q. [], at any point, did you try to get out of the car and leave?

A. No.

Q. Why not?

A. Honestly, if I felt like, or I felt like if I got out of the truck, um, he would run me over.

Q. You felt like he would run you over?

A. Yes.

(Pause)

Q. What were, what were you feeling like during this encounter?

A. I was scared.

Q. Scared? What were you scared of?

A.  Um, I mean, I really didn't know what was going on, so I just kind of went with everything.

Q.  Did you perform oral sex because you wanted to?

A.  No.

{¶193} Later, upon cross examination:[4]

* * * *.

Q.  How did, how did his penis, uh, get out?

A.  He took it out.

Q.  And you saw he was doing that?

A.  Yes.

Q.  Okay.  And did you want that to happen?

A.  No.

Q.  You didn't want his penis to come out?

A.  No.

Q.  Okay.  So what did you say?

A.  I didn't say anything.

Q.  Okay.  You didn't say don't do that?

A.  No.

Q.  You didn't say stop?

A.  No.

---

[4] T. 39-54.

Q.  So although he's getting his penis out during this make-out session and you don't want that to happen, you didn't say stop?

A.  No.

Q.  After his penis was out, where was your hand?

(Pause)

Q.  It was on his penis, wasn't it?

A.  Yes.

Q.  Okay.  And what was your hand doing on his penis?

A.  Nothing.

Q.  It was just holding it?

A.  Yep.

Q.  It wasn't, you know what a hand job is?

A.  Yes.

Q.  Were you giving him a hand job?

A.  No.

Q.  Are you sure about that?

A.  Yes.

Q.  But your hand was on his penis doing nothing?

A.  Yep.

Q.  You were not giving him a hand job?

A.  No.

Q. And then there was a discussion about, um, a blow job, wasn't there?

A. I don't recall that.

Q. You don't recall that?

A. No.

Q. Um, you don't recall him asking you to give you (*sic*) a blow job?

A. No.

Q. Or for you to give him a blow job, I'm sorry?

A. No.

Q. Now, it's your testimony that he, he took his hand and, around your neck?

A. Yes.

Q. And forced you down?

A. Yes.

Q. Um, how much force was used?

A. Enough to push me down.

Q. Did he squeeze your neck?

A. No.

Q. Did he grab, you have long hair, was it under your hair, was it on top of your hair?

A. I don't know.

Q. Was your hair down like it is today?

A. Yes.

Q. So was it, was it on your hair or was it under your hair on your neck?

A. I don't know.

Q. Did he pull your hair?

A. No.

Q. When he reached and grabbed your neck, uh, was it his right hand or his left hand?

A. His right hand.

Q. His right hand. Uh, he just used one hand?

A. Yes.

Q. Uh, did you, when he, I, I assume you saw him reaching for your neck, is that correct?

A. Yes.

Q. And at the time he was reaching for your, you saw him reaching for your neck, your hand was still on his penis?

A. Yes.

Q. And you had not moved it?

A. No.

Q. You had the opportunity to move it, but you didn't?

A. Yes.

Q. So as you saw him reaching with his hand for the back of your neck, did you say anything to him?

A.  No.

Q.  You didn't say stop?

A.  No.

Q.  You didn't say what are you doing?

A.  No.

Q.  And then he, he, you said that he takes the back of your neck and he starts to push it towards his lap, towards his penis?

A.  Yes.

Q.  Okay.  At that point, it became clear to you what, at least what he wanted?

A.  Yes.

Q.  And what did you say?

(Pause)

A.  I don't think I said anything.

Q.  You didn't say anything.  You didn't say stop?

A.  No.

Q.  You didn't say I don't want to?

A.  No.

Q.  You didn't say anything.  Uh, did you attempt to, uh, remove your head, uh, your neck from his hand to try to get away from him?

A.  No.

Q. You didn't try to get away? Not at all?

A. No.

Q. So as he was moving your head towards his penis, you said that when you got close to his penis, your, his penis hit your forehead?

A. Yes.

Q. And at that point, did you say anything?

A. No.

Q. Now, at this point, your, your face is near his penis, correct?

A. Yes.

Q. You know what he wants?

A. Yes.

Q. You haven't said no, right?

A. Yes.

Q. You haven't told him you didn't want to, right?

A. Yes.

Q. Did he ever, did he at that point threaten you?

A. No.

Q. He never threatened you, did he?

A. No.

Q. So how did your mouth get on his penis?

(Pause)

A.  I put it there.

Q. You put it there.

(Pause)

Q.  So you, at that point, as you testified, gave him a blow job?

A.  Yes.

Q.  Okay.  And just so we're clear, that is, uh, that's oral sex?

A.  Yes.

* * * *.

[H.T.  describes  appellant  exiting  the  truck  after  a  few minutes of oral sex and coming around to her side.]

Q. * * * *.  Okay.  So he gets, he opens the passenger door and you're seated in the passenger seat, correct?

A.  Yes.

Q.  How did you get to that point?

A.  He told me to lay back down.

Q.  He told you to lay back down?

A.  Yes.

Q.  So he didn't, he didn't push you down, he didn't pull you down, he didn't force you down?

A.  No.

Q.  He just said lay back down the way you were?

A. Yes.

Q. And you have the option to say no?  Correct?

A. Yes.

Q. You had the option not to do it?

A. Yes.

Q. But you didn't?

A. Yes.

Q.  So you laid back down and if I understand your testimony, you leaned your head , head back that way?

A. Yes.

Q.  He inserted his penis in your mouth?

A. Yes.

Q. How did he get your mouth open?

(Pause)

A. He told me to put my mouth on it.

Q. Okay.  So he didn't slap you?

A.  No.

Q. He didn't threaten you?

A. No.

Q. He said "Put your mouth on it" and you did?

A. Yeah.

Q. Did you say no?

A. No.

Q. Did you say, "I don't want to?"

A. No.

Q. You didn't?

A. Yeah.

Q. He finished in your mouth, is that correct?

A. Yes.

Q. And then, um, you said that you, you spit it on the parking lot?

A. Yes.

Q. And did you tell the officer that? When you, ultimately you spoke to law enforcement, correct?

A. My dad did.

Q. Okay. You never spoke to law enforcement?

A. Not me directly.

* * * *.

{¶194} I do not take the decision lightly in reversing the decision of the trial court. This matter implicates a first-degree felony with significant consequences for all involved. I am also mindful that we are not in the best position to judge the credibility of the witnesses. However, in reviewing the sufficiency of the evidence in the light most favorable to appellee, I conclude a rational trier of fact would not be convinced of appellant's guilt beyond a reasonable doubt. Appellee presented insufficient evidence of force. Without more, such evidence does not warrant a delinquency adjudication for

rape. *In re L.R.F.*, 8th Dist. Cuyahoga No. 97905, 2012-Ohio-4284, 977 N.E.2d 138, ¶ 26.

**{¶195}** I have compared the evidence in this case to the evidence in other cases of rape involving allegations of forced oral sex. I do not find the allegation of appellant's hand on the back of H.T.'s neck to be insufficient per se, but from the context of the entire incident, a reasonable person find the element of force to be lacking. This case is distinguishable from those in which evidence exists of a hand on the head plus other indications of force: an inherently coercive relationship between parties of disparate size and age [*In re N.K.*, 8th Dist. Cuyahoga No. 82332, 2003-Ohio-7059 (10-year-old offender threatened five-year-old victim that he would tell her friends not to play with her and pushed her head down to gain compliance)]; a family relationship which established the victim's will was overcome by fear [*State v. Toth*, 9th Dist. Lorain No. 05CA0008632, 2006-Ohio-2173 (victim observed mother in physically abusive relationship with offender who was also her father)]; overt verbal and physical resistance by the victim plus overt force applied by the offender [*State v. Martinez*, 12th Dist. Clinton No. CA2005-08-013, 2006-Ohio-2718 (offender cornered victim, held his head down, and attempted to force victim to perform oral sex as victim tried to pull away)]; [*State v. Wallace*, 8th Dist. Cuyahoga No. 86794, 2006-Ohio-2735 (offender touched victim's vagina and breasts and pushed her head down forcibly, forcing his penis into her mouth despite her crying and resisting)]; [*State v. Ball*, 4th Dist. Hocking No. 07CA2, 2008-Ohio-337, appeal not allowed, 118 Ohio St.3d 1463, 2008-Ohio-2823, 888 N.E.2d 1114 (victim protested as offender attempted to force her head near his penis, stating she didn't want to do this)].

{¶196} As another appellate court stated in a case with a similar outcome, "[w]e are aware that the facts of this case are sensitive, and we do not condone [appellant's] behavior.  However, we are bound to follow the law objective and apply it justly."  *State v. Theodus*, 8th Dist. Cuyahoga No. 97290, 2012-Ohio-2064, ¶ 48.  I find appellee failed to present sufficient evidence to sustain appellant's conviction for rape.  Therefore, I would sustain Appellant's first assignment of error.

{¶197} I further concur with the disposition of Appellant's second assignment for the reasons stated by Judge Hoffman.