## State v. McMillan
*[Cite as 6 AOA 281]*

Case No. 89CA004658
Lorain County, (9th)
Decided August 1, 1990

*Gregory A. White, Prosecuting Attorney, 226 Middle Ave., Elyria, Ohio 44035, for Plaintiff.*

*Hollace B. Weizel, Attorney at Law, 522 Broadway, Lorain, Ohio 44052, for Defendant.*

BAIRD, P.J.

This cause comes before the court upon the appeal of Curtis Gene McMillan from his conviction for one count of rape in violation of R.C. 2907.02(A) (2) and one count of gross sexual imposition in violation of R.C. 2907.05(A) (3).

Because of incriminating statements made by his eleven-year-old son and his twenty-two-year-old daughter, McMillan was arrested and was taken to the Elyria police station for questioning. McMillan's arrest occurred at 11:03 p.m. The booking and fingerprinting process lasted until 1:00 a.m. From 1:00 a.m. to 3:28 a.m., Detective Riley, from the youth bureau, talked to

McMillan concerning his prior history and the events leading to his arrest. At 3:28. a.m., Det. Riley read McMillan the *Miranda* warnings, see *Miranda v. Arizona* (1966), 384 U.S. 436, and then proceeded to tape the ensuing interrogation.

Prior to trial, McMillan sought to suppress the taped statement he made to the detective. The court denied the motion, concluding that McMillan's statement was knowingly, voluntarily, and intelligently made. The case proceeded to trial. David McMillan, the defendant's son, testified that his father fondled him on various occasions, the most recent incident having taken place in the neighbor's garage. Vicky Skaggs, McMillan's daughter, testified that the defendant began to touch her breasts and genitalia when she was nine and that this conduct finally culminated at sixteen, when she was forced to engage in sexual intercourse with him. Besides McMillan's two children, the state presented two other witnesses, Det. Riley and a pediatrician who had examined David McMillan in 1985. The defense presented nine witnesses, including the defendant.

The jury convicted McMillan on both counts. The court sentenced him to a term of seven to twenty-five years on the rape count and to a concurrent term of two years on the gross sexual imposition charge. McMillan appeals and assigns five errors.

## Assignment of Error I.

"The trial court erred to the prejudice of appellant, and in violation of rights conferred by the Fifth and Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution, when it denied appellant's motion to suppress statements made while in police custody."

Appellant argues two points under this assignment of error. First, McMillan asserts that his taped responses to questions that he made after Det. Riley gave him the *Miranda* warnings are inadmissible because of his prior unwarned statement. Second, McMillan contends that, separate from the prior unwarned statement, his taped statement was not voluntarily made because he was under the influence of medication at the time the police questioned him.

As to the first argument, the Supreme Court of the United States has held that a subsequent warned confession may be admissible if the prior unwarned statement is voluntary. *Oregon v. Elstad* (1985), 470 U.S. 298, 314. Where the police ask questions of a suspect in custody without administering the required warnings,

*Miranda* mandates that the answers received be presumed compelled, and thus the state is prohibited from using them in its case in chief. *Id.* at 317. If, however, the initial questioning is uncoercive and the responses are voluntarily made, then the second statement made after *Miranda* warnings may be admissible. Id. at 318.

In the instant case, Det. Riley informed McMillan prior to engaging in a discourse with him that he would use only McMillan's taped statement against him. Det. Riley then asked McMillan if he had anything to say. At the suppression hearing Det. Riley testified that McMillan, "wanted to talk; so we talked." Riley stated, he talked to McMillan about McMillan's background, the statements McMillan's son and daughter had made, as well as other incidents. If Riley's initiation of his talk with McMillan can be considered an initiation of a custodial interrogation, then the statements that McMillan made were technically in violation of *Miranda*. After reviewing the totality of circumstances, it is clear, however, that McMillan voluntarily talked to Det. Riley after Riley initiated the conversation. Although statements he made prior to the *Miranda* warnings are not admissible in the prosecutor's case in chief, they do not taint the subsequent statements Riley elicited from McMillan after McMillan was read the *Miranda* warnings.

As the Supreme Court concluded in *Oregon v. Elstad, supra,* the relevant inquiry is whether, in fact, the second statement was voluntarily made. *Id.* at 318. The question of whether the accused's statements were voluntary is separate from the question of compliance with *Miranda*. Thus, formal compliance with the requirements of *Miranda* does not preclude proof that the statements themselves were involuntary. *State v. Chase* (1978), 55 Ohio St. 2d 237, 246. The court must determine whether the totality of the circumstances show that the statements are of the accused's flee and rational choice. *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 231.

McMillan contends that, because he was taking medication and possessed poor cognitive skills, his statement to Det. Riley was not the result of a free and rational choice. McMillan's wife testified that the defendant was taking prescribed dosages of muscle relaxants, pain medication, and kidney medication. A psychologist testified that McMillan scored a sixty-seven out of a possible one hundred on the Weschsler Memory Scale, which in the expert's opinion indicated that McMillan had difficulty in short-

term memory and concentration skills. The record reveals that despite the medication he was taking and despite his inability to concentrate and remember certain things, McMillan was able to coherently respond to Det. Riley's questions. Furthermore, Det. Riley testified that McMillan did not appear to be under the influence of drugs, and that his demeanor was such that an inquiry into his drug usage was not necessary. From our review of the totality of the circumstances, we cannot say that the trial court erred in determining that McMillan's responses to the police officer's questions were voluntarily, knowingly and intelligently made. Appellant's first assignment of error is not well taken.

Assignment of Error III.

"The trial court erred to the prejudice of appellant, and in violation of ORC Section 2907.02(D) & (E) and ORC Section 2907.05(D) & (E) when it failed to hold an in camera voir dire of witness who testified to other alleged sexual acts of appellant, and where such other acts testimony was inadmissible under ORC Section 2945.59."

McMillan complains that the trial court erroneously admitted his son's and daughters testimony concerning other sexual acts to which he allegedly forced them to submit. The defense counsel did not object to this testimony. We thus exercise our right not to consider an error that could have been called to the trial court's attention, but was not, which, in effect, foreclosed the trial court from correcting or avoiding such error. *State v. Williams* (1977), 51 Ohio St. 2d 112, paragraph one of the syllabus.

Assignment of Error V.

"The trial court erred to the prejudice of appellant, when it entered judgment of conviction on the second count of the indictment, where such conviction was against the manifest weight of the evidence. "

In his fifth assignment of error, McMillan claims that his conviction for gross sexual imposition per R.C. 2907.05(A)(3)[1] was against the manifest weight of the evidence. In reviewing a claim that a judgment is against the manifest weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of the witnesses. *State v. Martin* (1983), 20 Ohio App. 3d 172. We must determine from our review whether the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* David McMillan, defendant's

son, testified that his father was constantly touching his genitals, and that, in May of 1988, his father called him into a neighbor's garage under the pretext of checking to see if he had been bit by the neighbor's dog, told him to pull down his pants, and then proceeded to touch his penis. McMillan denies that he fondled his son in the garage and claims that he was just making sure that David had not been injured by the dog.

McMillan claims that his son's testimony was sufficiently contradicted by the neighbor's testimony concerning the incident with the dog. Upon our review of the neighbor's testimony, we find that it did not significantly conflict with David McMillan's testimony. Furthermore, the neighbor testified that she could not see into the garage because she was in her house at the time that the alleged incident had transpired between McMillan and his son. We find that the judgment as to the gross sexual imposition count was not against the manifest weight of the evidence. Appellant's fifth assignment of error is not well taken.

Assignment of Error II.

"The trial court erred to the prejudice of appellant, and in violation of ORC Section 2907.02(D) & (E), ORC Section 2907.05(D) & (E), ORC Section 2945.59, Evidence Rule 404(B), and Evidence Rule 613 when it permitted the prosecution to introduce evidence of a prior sexual acts [sic] of appellant."

This claim of error is predicated upon Det. Riley's rebuttal testimony that, prior to receiving *Miranda* warnings, McMillan told him that he had engaged in sexual intercourse with his sister twenty-five years ago. The state presented the testimony to impeach McMillan's response to a question the state asked during cross-examination that involved the defendant's motivation for making certain incriminating statements to Det. Riley.

"***.

"Q. That the only reason you admitted to raping your daughter and fondling your son was so that you could have a bond of $150.

"Is that what your're trying to say now?
"A. Ma'am, I have --
"Q. Yes or no?
"A. I have never --
"Q. You have never what, Mr. McMillan?
"A. Raped, molested anybody."
"***."

Upon the completion of the defense's case, the state sought and received the court's permission to reopen its cross-examination of McMillan:

"***.

"Q. Mr. McMillan, when you were on the witness stand before the recess, you made the statement to the effect that you never would rape, molest or do anything else to anyone?

"A. Right.

"Q. Is that correct?

"Do you recall during the conversation that you had with Det. Riley on June 22nd of 1988, in the early morning hours of June 23rd, 1988, making the statement to him or discussing with him that you had engaged in sexual activity or intercourse with your sister when she was younger?

"MR. LUCAS: Objection.

"A. No, I never said anything like that.

"MR. LUCAS: Objection, Your Honor.

"THE COURT: Sustained as to the phraseology of that, sexual intercourse.

"Go ahead.

"MISS LILLY: Your Honor, would you like me to reask it?

"He has responded.

"THE COURT: Yes, but reask the question.

"Q. Mr. McMillan, did you tell Det. Riley that you had raped your sister when she was younger?

"MR. LUCAS: Objection.

"A. No, ma'am.

"THE COURT: No, overruled. That may remain.

"***."

Thereafter the state called Det. Riley, who testified that during his investigation of McMillan he had learned that the defendant had been involved with his sister when they were teenagers. The detective testified "that, prior to the taped interrogation, he asked McMillan about the incident and that McMillan acknowledged that it had occurred.

"***.

"Q. Det. Riley, referring to your conversation of June 22nd and 23rd with Mr. McMillan, you previously testified that you discussed various things with him prior to the time of the tape recording.

"Did you, at any time, have any discussions with him concerning his sister?

"MR. LUCAS: Objection, foundation.

"THE COURT: Did you get the time and place? I think you mentioned the taping?

"MISS LILLY: Yes. Prior to and during the taped conversations on June 22nd and June 23rd of 1988.

"THE COURT: Overruled.

"Go ahead.

"A. We discussed his sister prior to the taping, yes. (Emphasis added.)

"Q. And if you would, please state what that conversation involved.

"MR. LUCAS: Objection, Your Honor.

"THE COURT: Overruled.

"A. I learned in the investigation that there was an allegation that Mr. McMillan had had sexual intercourse with his sister.

"I asked him about it. He admitted that he had; but it was when they were a great deal younger. They were both teenagers; and the time span was so long, I didn't think there was anything could be done about it anyway."

"***."

The trial court instructed the jury that the officer's testimony could only be considered for credibility purposes.

The initial problem with the evidence of McMillan's statement as to his prior sexual encounter with his sister is that the statement was the product of a custodial interrogation that violated *Miranda v. Arizona, supra.* In both *Harris v. New York* (1971), 401 U.S. 222, and *Oregon v. Hass* (1975), 420 U.S. 714, the Supreme Court has held that statements made by a defendant in circumstances violating the strictures of Miranda are admissible for impeachment purposes if their trustworthiness satisfies legal standards. Unlike *Harris v. New York, supra,* and *Oregon v. Hass, supra,* the state sought to impeach McMillan's response to a question it asked on cross-examination. The Supreme Court has ruled, in the context of using statements given in technical violation of the exclusionary rule, that a defendant's statement made in response to proper cross-examination reasonably suggested by the defendant's direct examination are subject to otherwise proper impeachment. *United States v. Havens* (1980), 446 U.S. 620.

The state's question concerning McMillan's motivation for divulging incriminating information to Det. Riley was somewhat suggested by McMillan's direct testimony concerning the police interrogation. Although McMillan's own answer was not responsive to the state's question, this court is unwilling to hold that the state's use of the prior statements to impeach McMillan went beyond the scope of impeachment set by the United States Supreme Court.

While we have decided that the state's impeachment technique did not violate *Miranda v. Arizona* and its progeny, we are now confronted with evidentiary problems brought about by

the prosecution's method of impeachment. The state claims that the testimony as to McMillan's prior sexual activity with his sister was properly admitted as a prior inconsistent statement pursuant to Evid. R. 613(B).[2] As a prerequisite, however, to admitting prior statements for impeachment purposes, the party offering the impeaching statements must satisfy a threshold inconsistency requirement. *State v. Kline* (1983), 11 Ohio App. 3d 208, 212. Although Ohio has adopted a liberal view as to what constitutes inconsistency, McMillan's statement to Det. Riley that he had sexual intercourse with his sister when they were teenagers does not contradict McMillan's trial testimony that he never molested or raped anybody.

Through the subterfuge of impeachment, the state successfully presented to the jury a prior act of the defendant that not only occurred twenty-five years ago, but was in reality offered to show that McMillan was prone to commit deviant sexual acts. We cannot sanction the use of the most egregious form of character evidence, prior acts, that is thinly veiled as credibility evidence. Appellant's second assignment of error is well taken.

Assignment of Error IV.

"The trial court erred to the prejudice of appellant, when over the objection of appellant, the trial court allowed Detective Riley to testify as an expert in profiles of victims and offenders of sexual abuse."

In his fourth assignment of error, McMillan claims that the trial court abused its discretion in permitting Det. Riley to testify as an expert on the Common characteristics of sexual abusers and victims of sexual abuse. For analytical purposes we will separately discuss Riley's testimony depending upon whether it related to a victim of sexual abuse or a sexual abuser.

## I. EXPERT TESTIMONY ON TRAITS OF A VICTIM OF SEXUAL ABUSE OFFERED FOR CREDIBILITY PURPOSES

David McMillan testified that he was angry and upset when his father fondled him. Two defense witnesses testified that they observed McMillan and David together on various occasions and that David looked happy when he was with his father. On rebuttal, the state called Det. Riley to the stand and proceeded to qualify him as an expert witness. Det. Riley testified that he had been a police officer for seventeen years and had worked in the youth bureau for five years. At the bureau he investigated crimes involving children, both as victims and as offenders. As a

detective in the youth bureau he had undertaken approximately three hundred investigations of crimes involving sexual abuse. He attended a two-week seminar on sexual abuse in California, as well as local seminars. After qualifying bet. Riley as an expert, the following discourse took place between the state and the detective:

"***.

"Q. With respect to victims of sexual abuse, has it been your experience in the victims with whom you have worked during the past 5 years, that those victims exhibit any particular attitudes? Happy? Unhappy?

"Can you tell from their outward attitudes that they are a victim of sexual abuse?

"MR. LUCAS: Objection.

"THE COURT: Overruled.

"A. There's no set pattern. I have had them where they've cried. I have had them when they were happy.

"No two are alike.

"Q. So, from your personal experience, have you had cases which you know resulted in convictions either through an admission by the offender or conviction through The Court System where the victims were seemingly happy children?

"MR. LUCAS: Objection.

"A. Yes.

"THE COURT. You probably should do that by opinion.

"You have established him as an expert; so, it should be opinion; but, go ahead.

"Q. Is it then your opinion, Det. Riley, that a child's outward actions or the perception that other people may gain as to the child's happiness or unhappiness would not be relevant to whether or not they have been the victim of child abuse or sexual abuse?

"A. No, it wouldn't.

"***."

McMillan objects to Det. Riley's testimony on the grounds that he was not qualified to testify on the psychological makeup of a victim. Evid. R. 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify if that witness's scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence. While this court believes that the best possible experts to testify in these cases are those from the mental health field who possess clinical experience with intrafamily child sexual abuse,[3] we cannot say that the trial court abused its discretion in determining that Det.

Riley possessed the experience to testify as to his observations concerning victims of sexual abuse.

Ohio recognizes the use of expert testimony to bolster the credibility of sexually abused children. See *State v. Garfield* (1986), 34 Ohio App. 3d 300; *State v. Timperio* (1987), 38 Ohio App. 3d 156. This court has on occasion permitted expert testimony in sexual abuse cases when it is offered to rehabilitate a victim's credibility:

1. To explain why the victim did not initially tell the entire story to a mental health therapist. *State v. McMillan* (April 19, 1989), Lorain App. No. 4392, unreported;

2. To explain why a victim recanted her story. *State v. Holland* (Oct. 14, 1987), Lorain App. No. 4193, unreported; and

3. To explain why the victim delayed in reporting the incident. *State v. Ziruolo* (June 26, 1985), Summit App. No. 11960, unreported; *State v. Moore* (Mar. 8, 1989), Medina App. No. 1736, unreported.

Like the testimony given in the above cited cases, Det. Riley's testimony was presented to rebut the rather subtle inference created by the defense witnesses that, because David appeared to be happy when he was with his father, he must have fabricated the story of his abuse. Det. Riley's observations were helpful to the jury, for they dispelled a misperception that a child who is abused will manifest this fact by his demeanor and actions. Det. Riley's testimony discussed the reactions of victims of abuse generally and thus his testimony was more reliable than if he had attempted to label a particular child, i.e. David, as sexually abused. McCord, Expert Psychological Testimony About Complainants in Sexual Abuse Prosecutions: A Foray into the Admissibility of Novel Psychological Evidence (1986), 77 J. Crim. L. and Criminology 1, 63. Thus, we find that the trial Court did not abuse its discretion in allowing Det. Riley to testify concerning the outward appearance of children who have been sexually abused in order to combat the inference that David's testimony was not credible.

## II. EXPERT TESTIMONY AS TO THE PROFILE OF A SEXUAL ABUSER

McMillan argues that Det. Riley's testimony, in which he described one common characteristic of the sexual abuser, should have been excluded because it was highly prejudicial. Earlier in the trial, through the state's cross-examination of McMillan, the jury heard that McMillan had been sexually abused when he was younger.

"***.

"Q. Now, to refresh your recollection, you have already heard the tape recording of your statement to Det. Riley. You discussed with him the fact that, as a child, that you were sexually abused?

"A. Yes.

"Q. Okay. And during that discussion with him, the tape-recorded aspects of your conversation, you said that you never told anybody that you had been sexually abused?

"A. That's right. I buried it over 30 years ago.

"Q. So, that happened 30 years ago?

"A. Well --

"Q. Roughly 30 years ago?

"A. Yes. I was approximately, around 12 years old when all this really happened.

"Q. All right. That's fine. And you said you never told anybody about it?

"A. No, I buried it.

"Q. So, then, you can understand that when, such as, your daughter or anybody else who is sexually abused, they might bury it also for a period of years before telling anybody?

"MR. LUCAS: Objection.

"MR. McCLURE: Objection."

Det. Riley on rebuttal testified there was one characteristic common to all offenders, and that common trait was that offenders were also victims earlier in their lives:

"***

"Q. Have the seminars addressed any common characteristics among offenders or victims?

"A. There's one thing that they have in common.

"MR. LUCAS: Objection, Your Honor.

"THE COURT: Well, overruled. Go ahead.

"A. Normally, in 85 to 90 percent of the cases, an offender was also a victim earlier in his or her life.

"Q. And have you, in the approximately 300 investigations that you have personally been involved with, have you found that characteristic or that to be a commonality among some of the offenders that you have interviewed?

"MR. LUCAS: Objection.

"THE COURT: Overruled.

"A. It's about 85 to 90 percent of the time. If the offender feels like talking about it, we find that they were also victims.

"***."

The state contends that, because Det. Riley was qualified as an expert on child abuse, the trial court properly admitted the testimony. The issue here, however, is not whether Det. Riley

possessed the proper qualifications to speak upon the subject of abuse, but whether his testimony assisted the trier of fact.

Pursuant to Evid. R. 402 and Evid. R. 702, expert testimony is admissible whenever it is relevant and can assist the trier of fact. *State v. Williams* (1983), 4 Ohio St. 3d 53, 58. Even relevant evidence, however, must be excluded if its probative value is outweighed by danger of unfair prejudice, confusion of issues, and misleading the jury. Evid. R. 403. Novel expert testimony to assist the trier of fact must also be based upon principles that have been accepted by the scientific community. *State v. Koss* (1990), 49 Ohio St. 3d 213. (Battered woman syndrome has gained substantial acceptance to warrant admissibility.) If the subject matter of an expert's opinion is not accepted scientific evidence, an expert opinion is not helpful, for it is based upon an unreliable premise. From our review of the content of Det. Riley's opinion, scientific and legal writings, and other judicial decisions, this court concludes that the trial court erred by allowing Det. Riley to testify as to a common trait of sex offenders.

Most writers on the subject of sexual abuse agree that there are no common characteristics sufficient to constitute a profile of sexual abusers. Mccord, Syndromes, Profiles and other Mental Exotica: "A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases" (1987), 66 Ore. L. Rev. 19, 54. While clinicians utilize numerous psychological tests to evaluate sex offenders, these tests cannot determine whether a person has engaged or will engage in deviant sexual activity. Myers, Bays, Becker, Berliner, Corwin and Saywitz, Expert Testimony in Child Sexual Abuse Litigation (1989), 68 Neb. L. Rev. 1, 129. Another complicating factor in the use of profile testimony is that, by expert opinion, character evidence is presented to the jury.

"***'Group' character evidence, ***, attempts to prove that because *other persons* have acted in certain ways in the past, a defendant who shares common characteristics with those persons is likely to have acted the same way with respect to the crime charged. A moment's reflection on these categories of evidence reveals that 'group'character evidence is objectionable for the same-reason as is traditional character evidence: "probative value depends upon the jury drawing the forbidden inference that the defendant has a propensity to commit the crime with which he is charged."

"Prosecutors have succumbed to the temptation to offer 'group' character evidence in two contexts: 'battered child cases and child sexual abuse cases.

"***"McCord, Syndromes, Profiles and other Mental Erotica, *supra*, at 52. Although Evid. R. 404(A)(1) permits the accused to offer evidence of his character and permits the prosecution to offer evidence of the accused's charaCter to rebut the same, group character evidence of sexual abusers, at this point in time, is so unreliable and prejudicial that it should not be used even when the defendant puts his character in issue.

Our review of other jurisdictions convinces us that our decision to exclude profile evidence is correct. Some courts have excluded the testimony on the grounds that it possessed low probative value and was inherently prejudicial. *United States v. Gillespie* (C.A. 9 1988), 852 F. 2d 475; *State v. Miller* (Utah 1985), 709 P. 2d 350. Other courts have excluded profile testimony on the basis that it did not assist the jury in determining if the child was sexually abused. See *State v. Clements* (1989), 244 Kan. 411, 770 P. 2d 447. (In a trial for sodomy, a psychologist testified that one of the things that had been found in a great number of cases of abusers is that they have been abused sexually themselves in the past.) Quite a few courts have denied the use of profile evidence because the proponent of the evidence failed to show that it was based upon recognized and accepted scientific data. *United States v. St. Pierre* (C.A. 8 1987), 812 F. 2d 417; *People v. John W.* (1986), 185 Cal. App. 3d 801, 229 Cal. Rptr. 783 (1986); *State v. Cavallo* (1982), 88 N.J. 508, 443 A. 2d 1020.

In an Arkansas case, the court, in excluding the expert testimony, commented that the expert highlighted details of sexual abusers that mirrored details in the case before it. *Hall v. State* (1985), 15 Ark. App.. 309, 692 S.W. 2d 769, 773. Perhaps it is in this scenario that the use of profile testimony causes the most prejudice. In the present case, Det. Riley testified that abusers possess only one common characteristic-- that in the past they were victims of sexual abuse. This past sexual abuse history exactly matched McMillan's prior history. This matching of circumstances or details allegedly occurring in other sexual abuse cases with the circumstances or details of a particular case of alleged sexual abuse dissuades the jury from its purpose in deciding whether a particular act of abuse actually took place.

The type of evidence based on percentiles offered by Det. Riley must have a demonstrable foundation to be admissible. From our review of the record, we find that no scientific studies or authoritative treatises were presented at trial or on appeal. Until the scientific community develops a precise schemata of a sexual abuse offender that is sufficiently reliable, if such is possible, the use of profile evidence must be excluded. It fails to assist the trier of fact and creates highly prejudicial character inferences that confuse the jury and dissuade them from their truth-seeking function.

Based upon our disposition of the second assignment of error and the fourth assignment of error, we reverse the conviction and remand the Case for a new trial to be conducted in accordance with this opinion.

CACIOPPO, J., and CIRIGLIANO, J., concur.

---

[1] R.C. 2907.05(A) (3) reads:

"(A) No person shall have sexual contact with another, not the spouse of the offender: cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons, to have sexual contact when any of the following apply:

"***.

"(3) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of such person."

[2] Evid. R. 613(B) reads: ·

"Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded a prior opportunity to explain or deny the same and. the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(D) (2)."

[3] See Comment, The Admissibility of Expert Testimony in Intrafamily Child Sexual Abuse Cases (1986), 34 UCLA L. Rev. 175, 190. We note that other jurisdiction have recognized police officers as experts on the characteristics of sexual abuse victims. See *People v. Dunnahoo* (1984), 152 Cal. App. 3d 561, 577, 199 Cal. Rptr. 796, 804. See also *Scadden v. State* (Wyo. 1987), 732 P. 2d 1036, 1046-1047.