[Cite as *State v. Bandy*, 2017-Ohio-5593.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-160402 |
| | | TRIAL NO. B-1502211 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| DEANDRE BANDY, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 30, 2017

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Scott M. Heenan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, *David Hoffmann* and *Joshua Thompson*, Assistant Public Defenders, for Defendant-Appellant.

**CUNNINGHAM, Judge.**

{¶1}   After a jury trial, defendant-appellant Deandre Bandy was convicted of the aggravated murder and aggravated robbery of Justin Madaris, and the aggravated robbery of Daniel Steward.  He now appeals.  For the reasons that follow, we affirm.

## I. Background Facts and Procedure

{¶2}   Bandy and an unknown accomplice attempted to rob Madaris and his brother Steward at Ziegler Park, also known as Peaslee Park, in the early evening on April 24, 2015.  Bandy and his accomplice were both brandishing guns.  Madaris reacted by pushing the accomplice, causing him to drop his gun before running off. Madaris then tussled with Bandy before ascending the fence on the southern portion of the park.   Bandy shot Madaris in his right torso as Madaris was escaping over the fence.  Madaris collapsed in the parking lot of a bar on the other side of the fence, and died from his gunshot wound.

{¶3}   After shooting Madaris, Bandy turned his gun on Steward.  But before escaping, Steward used the gun dropped by Bandy's accomplice to shoot at Bandy, striking him at least once in the back.  Assisted by his accomplice, Bandy walked to Sycamore Street, where he collapsed on a sidewalk in front of passers-by who had called 911 upon hearing the shots fired.  Emergency personnel transported Bandy to University Hospital, where he was successfully treated.

{¶4}   While at the hospital, Bandy told officers seeking information about the shooting that he had been robbed and shot by masked assailants at the park. Bandy also told the police that he had not fired a gun.  Bandy provided a similar account of the night's events about six hours after the shooting when he was interviewed at the police station and had been advised of his *Miranda* rights.

2

Bandy's statements conflicted with the statements of multiple eyewitnesses who saw Bandy fire a gun, and were not consistent with the positive result of a gunshot residue ("GSR") test performed on Bandy's hands at the hospital.

{¶5}    Bandy was later indicted for aggravated murder, in violation of R.C. 2903.01(B), murder, in violation of R.C. 2903.02(B), and two counts of aggravated robbery, in violation of R.C. 2911.01(A)(1), all with firearm specifications. Bandy's first attorney filed a motion to suppress Bandy's pretrial statements. After substitute counsel had been appointed, Bandy raised the affirmative defense of self-defense, claiming that he had been the victim of an aggravated robbery, and his counsel effectively withdrew the motion to suppress.

{¶6}    At trial, Bandy testified that Madaris and Steward had robbed him and shot at him, and he had returned fire in self-defense, striking Madaris. He completely denied the allegations of the aggravated-robbery charges. The trial court instructed the jury that, among other things, they were to consider Bandy's claim of self-defense with respect to the aggravated murder and murder charges only, as Bandy was completely denying the aggravated-robbery allegations.

{¶7}    The jury rejected Bandy's defenses and found him guilty of one count of aggravated murder, one count of murder, and two counts of aggravated robbery, all with firearm specifications. During sentencing, the trial court merged the murder into the aggravated murder and some of the firearm specifications, and imposed life without parole for the aggravated murder, eleven years for each aggravated robbery, plus three years for the firearm specification associated with each count, all to be served consecutively. Ultimately, the court sentenced Bandy to an aggregate term of life without parole plus 31 years.

{¶8} In this appeal, Bandy raises the following five assignments of error: (1) his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence; (2) the trial court erred by overruling his Crim.R. 29(A) motion for an acquittal with respect to the aggravated robbery of Steward; (3) the trial court erred by imposing multiple sentences on allied offenses of similar import that were committed neither separately nor with a separate animus; (4) the trial court committed plain error by failing to instruct the jury to apply the defense of self- defense to all counts; and (5) trial counsel was ineffective for withdrawing the motion to suppress.

## II. Analysis

### A. Sufficiency and Weight-of-the-Evidence Claims

{¶9} Bandy's first two assignments of error challenge the sufficiency and quality of the evidence adduced at trial. To address these assignments of error, we provide a detailed account of this evidence.

{¶10} *The state's evidence.* Steward testified that on the day of the shooting, he met his half-brother Madaris at Zeigler Park around 5 p.m. Madaris had a fresh bag of marijuana, which he was selling and sharing with Steward. The park was crowded, and Steward's infant son and mother were there, too. At around 7 p.m., when it was still daylight, he and Madaris were sitting on a stone wall on the perimeter of the west side of the basketball courts, closer to the southern end of the basketball courts and Neons bar, which was located in a building on 12th Street and offered parking on the eastside of the building. The fence separated the basketball courts from Grear Alley and Neons' parking lot.

{¶11} According to Steward, as children played on the basketball courts, he and Madaris took pictures of his baby, whom they had dressed with their flashy

4

jewelry. Steward was holding the baby and Madaris was videotaping the baby with Steward's phone. The video recording, which was admitted into evidence, showed Steward wearing a black hoodie with large white lettering on the front and sleeves.

{¶12} The recording ended abruptly when Madaris dropped the phone, causing the screen to break. At that point, Steward looked up and saw Bandy and an accomplice, who was wearing teal clothing, running towards them brandishing revolvers. Startled, Steward dropped the baby. Steward heard Bandy exclaim, "You all know what this is," and told his accomplice "to get that shit up," referring to the jewelry on the baby.

{¶13} Steward said that when Bandy's accomplice reached for the brothers' jewelry, Madaris pushed him, and the accomplice dropped his gun before running away. Madaris then began "tussling" with Bandy over his gun. When Bandy "slipped out," Madaris ran away from him towards a damaged portion of the fence on the southern side of the basketball courts near Neons. Bandy then shot at Madaris two times, striking him once, which caused Madaris to scream. Steward described Bandy as slowly walking and holding the gun with his arm extended when he shot at Madaris as Madaris tried to flee.

{¶14} Steward said that Bandy then turned his gun on him, as he stood on the western edge of the courts. In response, Steward used the gun he had recovered from the ground to shoot at Bandy, striking Bandy at least once. After firing all the bullets, Steward dropped the gun and ran off the court with his baby in a westerly direction towards Main Street, while Bandy exited from the other side of the court and headed in the opposite direction towards Sycamore Street. Steward thought Bandy's gun was black, but he was sure that the gun he fired was silver.

{¶15} Several other eyewitnesses to the shooting testified for the state. Augustus Denton stated that, on the night of the shooting, he was playing dominos in the gazebo on the northern side of the park. Before the shooting, he had seen his friend Madaris with Steward sitting on the western wall of the basketball courts with a baby. At around 7 p.m., he saw Madaris struggling with a man near the wall. Madaris then broke away and began to ascend the fence that separated the basketball courts from Neons. Denton then saw someone shoot at Madaris. He claimed that he heard more than three gunshots fired.

{¶16} After hearing the gunshots, Denton went to get his car, which was parked north of the park, so that he could assist Madaris. On his way, he noticed a black male on the ground near the eastern gate to the basketball courts, and another black male assisting him. Denton then drove to Neons, where he found Madaris lying in the parking lot struggling to stay alive and surrounded by "a lot of people."

{¶17} Katie Beck and Michelle O'Brien were among those standing in the parking lot of Neons around 7 p.m. waiting to participate in a 30th birthday party celebration that was to take place aboard a "pedal wagon" temporarily parked in the lot. Beck had just been dropped off by her husband, and was going to greet her friends standing by the pedal wagon, when she heard gunshots coming from the basketball courts at the park. She then saw a man walking towards Neons and firing a silver gun before ducking for safety behind a four-door white car next to the pedal wagon.

{¶18} Beck testified that when she heard gunfire, she had also seen a man climbing over the fence from the basketball courts. After the gunfire stopped, she saw that man run by her and collapse in Neons' parking lot, where her nurse friends tended to him. She did not see a gun in his hand or around him. Although she could

not identify the shooter, she was sure that he was not the person lying in Neons' parking lot with a gunshot wound, and that the shooter had not been holding a baby.

{¶19}   O'Brien testified that she had just exited from Neons and had walked out to greet the pedal wagon driver in the parking lot when she heard popping noises from the basketball courts that she was facing.  Before she dropped to the ground, she noticed a young African American male wearing a black hoodie shoot once from a "very shiny revolver" aimed in the direction of Main Street.  She described the shooter as "walking very purposefully" across the court as he shot and prepared to shoot again.  She stated that she could not see anyone except for the shooter, but indicated that her viewpoint was blocked by a tree and a wall.

{¶20}   After the gunfire stopped, she got up and saw the shooter run east and out of the basketball court area.  She saw a gunshot victim lying on the ground in Neons' parking lot.

{¶21}   Katie Beck's husband Lenny Beck ("Lenny") also testified. He stated that he was driving north on Sycamore Street near 12th Street after leaving his wife in Neons' parking lot.  He heard "several pops," and when he looked to his left as he passed an alley he saw a "young, darker-complected African-American man" on the basketball courts holding a silver gun.  The shooter was briskly walking in the direction of Neons, "like with a purpose," and shooting in that southerly direction. He was not able to see who the shooter was aiming at, but he confirmed that the shooter was not holding a baby.

{¶22}   Lenny stated that after witnessing the shooting, he looped around the block and returned to Neons, where he saw an African-American man lying in the parking lot of Neons, tended to by his wife's friends.  He did not notice a gun near

this man, and he was sure that man was not the shooter whom he had earlier observed on the basketball courts.

{¶23}   Lenny's testimony was similar to that of Patrick Reynolds-Berry, who was walking down Sycamore Street with his wife on their way to a Reds baseball game at around 7 p.m. after parking their car on 13th Street.  Like Lenny, Reynolds-Berry looked west towards the basketball courts at the park after hearing gunshots. He described the shooter as walking south, "like with a purpose, with his arm raised, shooting forward."  He observed the muzzle flash of the gun one time.  He believed he had heard at least three shots total, but he also described the events occurring as "almost instantaneous[ly]."  He and his wife ran forward and ducked behind a building, where his wife initiated her call to 911.

{¶24}   He said that when he and his wife moved past the building and reached Grear Alley, the shooter was no more than ten feet away and walking towards the alley with a gun in his hand.  He and his wife backed up.  The shooter then took the alley to the sidewalk on Sycamore Street and collapsed in front of Joe's Diner, a restaurant.  Reynolds-Berry unequivocally identified Bandy as the shooter that he had seen that evening.

{¶25}   Reynolds-Berry also testified that he had seen a man wearing a teal hoodie walking on the basketball courts with Bandy and also walking with Bandy to Sycamore Street.  That person hung around Bandy until the police and paramedics arrived, when he walked off.  While Bandy lay on the ground wounded, Reynolds-Berry heard him ask the man in teal clothing to "call [his] mom."

{¶26}   Similarly, Allison Reynolds-Berry ("Allison") testified that after hearing "loud noises," she looked to the basketball courts and saw two men walking and shooting in a southerly direction, and that those same two men later walked

down Grear Alley towards them before one collapsed in front of Joe's Diner on Sycamore Street. She recalled that one man was wearing a "dark color," such as black or navy blue, and the other was wearing a "blue" hoodie, and that the one in the darker color was injured and was leaning on the other as they walked down the alley. She observed, like her husband, that the two seemed like friends and that the injured one had asked the other man to "call [his] mom."

{¶27} Allison confirmed that she had called 911, and the recording of her call was admitted into evidence. During the call, she described both the shooters and the path she was observing them take to Sycamore Street, where Bandy collapsed.

{¶28} Dr. Jennifer Scott, the deputy coroner who performed Madaris' autopsy, testified that Madaris died of a gunshot wound to his torso. The bullet entered the right side of his body from a gun "perpendicular" to his body, traveled across his body, and never exited.

{¶29} Based on Madaris' injury, Dr. Scott believed that he survived for a few minutes and he could have been mobile during those few minutes. The results of a toxicology screen indicated that Madaris had a small amount of alcohol and some marijuana in his blood, and an inventory of items found on Madaris included two bags containing a green leafy substance. The coroner's report indicated that Madaris measured about six feet in length, weighed 240 pounds, and that he had been wearing a black hooded sweatshirt when he was shot.

{¶30} The investigating officers also testified. Criminalist Patrick Moran responded to the crime scene and indicated that he had not located any weapons, bullets, or spent casings on the scene. But he had discovered a bullet hole in a vehicle parked in Grear Alley between the basketball courts and Neons' parking lot. Criminalist Moran also recovered a pair of glasses on the stone wall on the western

part of the basketball courts where Steward testified that he and Madaris had been located before they were attacked. DNA found on the glasses matched that of Madaris. Further, Criminalist Moran authenticated a photograph of the black, hooded sweatshirt with a bullet hole that Bandy was wearing when admitted to the hospital, and a photograph of Bandy's Ohio identification card that indicated his height of five feet ten inches and weight of 156 pounds.

{¶31} Specialist Ryan Jones and Detective Sandy Sieving both spoke with Bandy after he was taken to University Hospital for treatment of a gunshot wound to his lower back. Specialist Jones testified that he was working an off-duty detail at University Hospital in the emergency room when Bandy was brought in as a shooting victim. After Bandy received his preliminary medical treatment, Specialist Jones quickly asked him basic questions about how he received his injury. Bandy told him that he had been playing basketball with another individual from the neighborhood when three masked individuals, one brandishing a silver gun, attempted to rob him. Bandy said he ran away but was shot and collapsed on the next block. Specialist Jones stated that he shared this information with the Cincinnati police, and Detective Sieving was sent to the hospital to perform a follow-up interview with Bandy.

{¶32} Detective Sieving testified that she spoke with Bandy less than an hour after he had been brought to the hospital, when he was still in the triage area of the emergency room. At that time, she believed he was a victim, but pursuant to standard protocol for gunshot victims, she swabbed his hands for gunshot residue. Later, those swabs were determined to contain gunshot residue.

{¶33} In Bandy's interview with Detective Sieving, which was recorded and played for the jury, he gave a more detailed account of the robbery and shooting. He

claimed that he had gone to the park to play basketball after having a fight with his girlfriend, who was upset that he would not give her money, and that he was robbed by two, not three, armed masked assailants, one of whom shot him. He unequivocally denied shooting a gun, but he did claim to grab at one of the guns before running away.

{¶34} Detective David Gregory was the state's final witness. He testified that he had interviewed several eyewitnesses in his Criminal Investigation Section ("CIS") office shortly after the shooting, but not Steward, whom he did not interview until April 29th. Based on these early interviews, he began to believe that Bandy was the individual that Patrick and Allison Reynolds-Berry had seen walking down Grear Alley with a gun. Because of this, he had Bandy brought to his office for an interview upon his release from the hospital, which was about six hours after the shooting incident.

{¶35} Detective Gregory stated that after Bandy waived his *Miranda* rights, he interviewed him. A recording of the ensuing interview was admitted into evidence and played for the jury.

{¶36} During the interview, Bandy maintained that he had been robbed by two masked men, one of whom shot him. For the first time he mentioned that he had been assisted by a stranger wearing a blue shirt. Bandy again denied shooting a gun. Officer Gregory explained that eyewitnesses had seen him shooting at Madaris, and that Madaris had died. Officer Gregory then asked Bandy if someone had been shooting at him and he had fired back. Bandy repeatedly denied that scenario, at one point stating, "[t]hat ain't how it went, bro."

{¶37} On cross-examination, Officer Gregory admitted that the police did not recover much physical evidence from the crime scene. He also acknowledged

that during the initial interviews, the police had obtained a statement from the pedal wagon driver indicating that the person who fired the shots was the same person who had traversed the fence into Neons' parking lot. But Officer Gregory explained that he had discounted this statement because the driver had been busy at the time of the shooting collecting money from the pedal wagon patrons, with his back towards the basketball courts.

{¶38} *The defense's evidence.* After the state rested, Bandy testified in his own defense. He began and ended his testimony by acknowledging that he had not been truthful when he gave his prior statements to the police. He explained that when he spoke to the police, he was not thinking clearly due to his injury and treatment, and he was scared that Steward and his friends in the neighborhood would harm him and his family.

{¶39} Bandy stated to the jury, as he had to the police, that on the day of the shooting he and his girlfriend had fought over money. But in his testimony he added the claim that after the fight, he was looking to purchase some marijuana to calm him down. While looking for marijuana, he saw an acquaintance named Jonathan, whom he knew as "John-John." John-John told him he knew a dealer, but he could not call him on his malfunctioning phone. Because John-John's phone was allegedly not working, and Bandy's phone was not charged, the two ended up at a battery store at the intersection of Walnut and Liberty Streets. Outside the store, John-John introduced Bandy to a dealer named "Ratchet," who pulled up in a grey Grand Prix with a passenger named Jada. Bandy told Ratchet that he wanted to purchase an ounce of "Loud" and showed him the money to purchase it at the price of $275 an ounce. Ratchet told him to meet him down at "Peaslee Park," which is also known as Zeigler Park. Although that park was located several block away, in an area that

Bandy felt was not safe, Bandy agreed to the meeting, and Ratchet assured him that he "r[a]n[] the block down there."

{¶40}   Bandy claimed that as he headed down to the park with John-John, he stopped at his girlfriend's apartment under the ruse of using the restroom, but for the purpose of getting his gun in case he needed it.  When he locked the apartment door, he placed his money in his left pocket as John-John stood watching him.  As they neared the park, John-John slowed down and had a conversation on his allegedly malfunctioning phone while Bandy marched forward to get the marijuana.

{¶41}   According to Bandy, when he entered the basketball courts, he did not see anyone but a boy named Junior, who was his cousin's friend.  He shot baskets with Junior on the court closest to Neons until Junior took off running for the exit on the north side of the courts.  Bandy then observed Madaris and Steward approaching from behind, brandishing guns and wearing black hoodies.  Madaris ordered Bandy to hand over his belt and the money in his "left" pocket.  When Madaris momentarily looked at Ratchet's Grand Prix, Bandy grabbed the larger Madaris, pushed him, and took off running.  As he was running, Steward shot him.   He fell to the ground and his gun slipped down his pants.  But Bandy stood up and Steward shot him again, striking him in the back and causing him to fall to the ground again.

{¶42}   Bandy testified that he then grabbed his gun, which had fallen outside his pants, and fired two shots in the direction of Madaris and Steward, who were both shooting at him.  Bandy was adamant that he fired his gun only after he had been shot, and that he had been  lying on the ground at the time.

{¶43}   Bandy claimed that after he fired his gun, Madaris and Steward split up. Madaris ran over to the fence near Neons, and Steward ran north after picking up a baby, while he crawled to an opening in the fence on the east side of the courts and

pulled himself up by grabbing a fence pole. He said that he fell again and was crawling in the alley next to the courts when a man wearing a dark blue sweater with a small White Castle logo agreed to help him out of the alley for money. With this man's assistance, he made it to the sidewalk in front of Joe's Diner on Sycamore Street, dumping his gun in the dumpster behind the restaurant along the way. He then asked a random couple walking down the street, whom he identified in court as the Reynolds-Berrys, to call the police.

{¶44} According to Bandy, the man wearing the White Castle logo sweater indicated that he had warrants and then left, but only after Bandy gave him his mother's phone number and asked him to call her. An ambulance then arrived and took him to University Hospital.

{¶45} On cross-examination, Bandy was asked about his prior inconsistent statements to the police. He acknowledged that while he had been given medication, he "knew everything that [he] was saying" when speaking with the police, but maintained that he lied to protect the identity of his shooters because he was afraid.

### 1. Sufficiency of the Evidence

{¶46} On review of the sufficiency of the evidence to support a criminal conviction, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Our inquiry addresses the sufficiency of the state's evidence on each element to support the convictions, and not the strength of Bandy's evidence to support his affirmative

14

defense of self-defense. *See State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 38.

{¶47} When determining whether the trial court erred by denying a Crim.R. 29(A) motion for an acquittal, we apply a standard of review similar to our sufficiency of the evidence inquiry. A court should not grant a motion to acquit "if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *See State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus, cited in *State v. Myles*, 1st Dist. Hamilton No. C-050810, 2007-Ohio-3307, ¶ 49.

{¶48} *Aggravated Murder*. Bandy was convicted of aggravated murder, in violation of R.C. 2903.01(B), which provides in relevant part that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery."

{¶49} First, Bandy argues that the evidence was not sufficient to establish that he shot Madaris and that he did so purposefully. But the state offered sufficient evidence, if believed, to support beyond a reasonable doubt each element of the offense.

{¶50} Steward's testimony alone was sufficient to establish the essential elements of aggravated murder. And Steward's testimony was corroborated in part by testimony from the other eyewitnesses who also claimed that Bandy was standing and aiming at his target, who was located in the southwest corner of the basketball courts. Moreover, Bandy admitted that he had purposely shot Madaris, but claimed justification by reason of self-defense. Therefore, we reject Bandy's argument that the evidence was not sufficient to support his aggravated-murder conviction.

{¶51} *Aggravated Robbery.* Bandy was also convicted on two counts of aggravated robbery, in violation of R.C. 2911.01(A)(1), one count pertaining to Madaris and the other to Steward. The relevant language of the aggravated-robbery statute provides that "[n]o person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

{¶52} According to Bandy, the state failed to establish that the robbers had attempted to take any property from Steward while brandishing a weapon. He argues that Bandy's words and conduct were directed only to Madaris—the brother who had been selling drugs that day—as demonstrated by the fact that only Madaris had reacted by physically contesting the robbery.

{¶53} We are not persuaded by Bandy's argument. The state's evidence showed that Bandy and his accomplice approached both Madaris and Steward with guns drawn, Bandy announced that it was a robbery, and Bandy's accomplice reached for the brothers' jewelry, which Steward's baby had been wearing.

{¶54} When viewing this evidence in the light most favorable to the state, we conclude that a reasonable juror could have found that Bandy was announcing his intent to rob both brothers of their property, including, but not limited to, Steward's diamond bracelet that his baby had been wearing.

## 2. Weight of the Evidence

{¶55} Next Bandy argues that his convictions were against the manifest weight of the evidence. When considering a manifest-weight claim, we review the entire record, weigh the evidence and all reasonable inferences, and consider the

credibility of witnesses. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The question in reviewing such a claim is whether in resolving conflicts in the evidence, and in rejecting Bandy's defenses, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *See State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Our discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶56} Bandy's manifest-weight argument centers around his contention that Steward's testimony was not credible, and that the testimony from the bystander eyewitnesses supported his claim of self-defense. To establish self-defense, a defendant must prove, by a preponderance of the evidence, that (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) he must not have violated any duty to retreat or avoid the danger. *See State v. Robbins*, 58 Ohio St.2d 74, 388 N.E.2d 755 (1979), paragraph two of the syllabus.

{¶57} Bandy contends that Steward's testimony was not credible because it conflicted at times with that of the other eyewitnesses. For instance, Steward testified that Bandy had fired first and had only fired two shots, but some of the bystanders testified that they had already heard gunshots before looking towards Bandy and observing him shooting two times. Also, Steward testified that Bandy's gun was black, and the gun he had recovered from the ground to shoot Bandy was silver. Some bystanders testified that the shooter they saw had a silver gun.

{¶58} We cannot say, however, that this seemingly conflicting testimony rendered Steward's testimony that Bandy was the aggressor and had fired first

17

incredible. The bystander witnesses indicted that the events unraveled "instantaneous[ly]," and Steward indicated that he had been focused on his baby and escaping when Bandy began firing at Madaris.

{¶59} Importantly, the state presented significant evidence that corroborated Steward's testimony about the robbery and murder. This included the evidence that supported Steward's claim that he and Madaris had been at the wall on the west side of the basketball courts, where the police found Madaris' glasses, and had been making a video of his son when Bandy and his accomplice ran up on them.

{¶60} Conversely, Bandy's self-defense theory fell flat at trial. Bandy's testimony conflicted with the testimony from several eyewitnesses who saw Bandy fire at Madaris while standing and walking towards his target. This testimony undermined Bandy's self-defense theory that he had fired while injured and lying on the ground and only after he had been shot. The coroner's testimony concerning the location of Madaris' wound on his torso and the path of the fatal bullet also rendered incredible Bandy's testimony that he had shot at Madaris while lying on the ground. Further, although they were asked, none of the eyewitnesses who testified for the state claimed to see anyone wearing a sweater with a White Castle logo at the scene.

{¶61} Bandy also contends that his self-defense theory was more credible because, upon his closer review of the video recording of Steward holding his baby, it appears that an individual other than Madaris was helping Steward place the jewelry on the baby. This, he claims, resulted in an unlikely situation of him and an accomplice robbing a group that outnumbered them. Although we agree with Bandy that the video may depict the hand or hands of another individual assisting Steward, an issue not explored at trial, our assessment of the footage indicates only that it depicts the hand or hands of a child helping Steward place the jewelry on the baby.

This is consistent with Steward's testimony that many children were playing at the park, and Bandy's own testimony that a boy he referred to as Junior was on the basketball court at the time of the incident. Ultimately, we are not persuaded by Bandy's newest argument.

{¶62} We are mindful that the weight to be given the evidence and the credibility of witnesses are primarily for the trial of fact, *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus, and that the jury, as the trier of fact, may believe all, part, or none of the testimony of each witness appearing before it. *See State v. Swiger*, 5 Ohio St.2d 151, 156, 214 N.E.2d 417 (1966). When we weigh the conflicting evidence against the ample corroborating evidence in this case, we determine that the jury did not clearly lose its way and create a manifest miscarriage of justice. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541; *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶63} Accordingly, we overrule the first and second assignments of error.

### B. Allied-Offenses Claim

{¶64} In his third assignment of error, Bandy argues that the trial court violated R.C. 2941.25 by imposing multiple sentences on allied offenses of similar import. Specifically, he contends that the aggravated-murder and aggravated-robbery convictions related to Madaris should have merged because they were of a similar import and were not committed separately or with a separate animus.

{¶65} Under R.C. 2941.25, the merger of allied offenses occurs when the conduct of the defendant can be construed to constitute two or more allied offenses of a similar import, and this conduct shows that the offenses were not committed separately or with a separate animus. *State v. Sanders*, 1st Dist. Hamilton Nos. C-140579 and C-140580, 2015-Ohio-5232, ¶ 46. When reviewing the defendant's

claim that there are allied offenses of similar import that merge into a single conviction under R.C. 2941.25, the trial court and the reviewing court on appeal

> must first take into account the conduct of the defendant.  In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

*State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 25.

{¶66}   This court reviews the trial court's R.C. 2941.25 determination de novo.  *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 1.  Here, Bandy did not object at the sentencing hearing to the imposition of multiple sentences for these offenses.  He has therefore forfeited this issue absent a showing of plain error.  *See State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31; *see also* Crim.R. 52(B).

{¶67}   We begin and end our analysis by examining whether the offenses were committed with a separate animus.  *See State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 83 (noting that a reviewing court may end its Ruff-test analysis upon an affirmative response to any of the three questions).  As we explained when discussing the sufficiency of the evidence to support the aggravated-murder conviction under R.C. 2903.01(B)(1), the requisite purpose to kill was amply supported in the record.  This purpose to kill was separate from the immediate motive of robbing Madaris and Steward, the animus involved in the aggravated robbery of Madaris.

{¶68} Because Bandy's conduct with respect to the aggravated murder demonstrated a purpose—a specific intent—to kill while, or in the course of, committing an aggravated robbery, the aggravated-murder offense was committed with a separate animus from the aggravated-robbery offense, and thus was separately punishable under R.C. 2941.25(B). *See Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at paragraph three of the syllabus. *See also Sanders*, 1st Dist. Hamilton Nos. C-140579 and C-140580, 2015-Ohio-5232, at ¶ 51. Accordingly, we overrule the third assignment of error.

### C. Claim of Plain Error in Instructing the Jury

{¶69} In his fourth assignment of error, Bandy argues that the trial court committed plain error under Crim.R. 52(B) when it instructed the jury that the defense of self-defense did not apply to the aggravated-robbery charges.

{¶70} A party claiming plain error under Crim.R. 52(B) must show (1) that an error occurred, (2) that the error was obvious, and (3) that the error affected the outcome of the trial. See State v. Barnes, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶71} Trial courts must give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the fact finder. *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. Here, the trial court instructed the jury that "regarding the allegations in Count 1 and 2 (aggravated murder and murder), the defendant claims to have acted in self defense." The court then gave an instruction on self-defense that Bandy

21

does not challenge. The court subsequently stated, "As noted above, the affirmative defense of self defense applies to Counts 1 and/or 2. The defendant simply denies the allegations in Counts 3 and 4." Bandy did not object to this instruction or request an additional instruction.

{¶72} Bandy now argues that the court's instruction was erroneous because it prevented the jury from considering the facts of his defense presented during his testimony, "that he was the one who was robbed—not the other way around," when considering the aggravated-robbery counts. We do not need to determine whether there is any merit to this argument, because Bandy does not address how he could have been prejudiced by the instruction when the jury rejected his self-defense testimony and found him guilty of purposefully causing Madaris' death while committing the aggravated robbery. Under these circumstances, we are confident that any error by the trial court was not outcome determinative. Thus, we conclude that Bandy has failed to demonstrate plain error, and we overrule the fourth assignment of error.

## D. Ineffective-Assistance-of-Trial-Counsel Claim

{¶73} In his fifth assignment of error, Bandy argues that he was denied his right to the effective assistance of trial counsel. A claim of ineffective assistance of trial counsel is reviewed under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An appellant must demonstrate that his counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *Id.* at 687. This court does not need to evaluate both prongs of the *Strickland* test if the appellant fails to satisfy one prong. *Id.* at 697.

{¶74} Because there are many ways for an attorney to provide effective assistance in a given case, and "the difficulties inherent in making the evaluation [of trial counsel's conduct], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * * ." *Id.* at 689. Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189 (1980).

{¶75} Bandy specifically contends that trial counsel was ineffective for not pursuing the motion to suppress his statements filed by the original attorney assigned in the case. Bandy contends the false exculpatory statements that he gave to Detective Gregory at the station after the *Miranda* warning, and the similar earlier statements provided at the hospital to other officers, would have been suppressed under *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), and *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985.

{¶76} In response to Bandy's assertions, the state argues that *Seibert* and *Farris* do not apply to demand the suppression of Bandy's three statements. The state also asserts that this court can presume that trial counsel's decision to withdraw the motion to suppress was a tactical one.

{¶77} We decline to decide whether Bandy has demonstrated that his statements to the police would have been suppressed under *Seibert* and *Farris*. We also decline to determine whether Bandy has overcome the presumption that trial counsel's decision to abandon the suppression issue was a tactical strategy in this case. We limit our review because it is clear that Bandy cannot meet the prejudice prong of the *Strickland* test.

**{¶78}** Bandy concedes that in this case the state could have used his false exculpatory statements, which were inconsistent with his trial testimony, to impeach that testimony, even if he had prevailed on the motion to suppress. *See State v. Hill*, 75 Ohio St.3d 195, 207, 661 N.E.2d 1068 (1996), citing *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *State v. McMillan*, 69 Ohio App.3d 36, 45, 590 N.E.2d 23 (9th Dist.1990), citing *Harris* and *Oregon v. Haas*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). Ultimately, the jury would have learned of the same inconsistent statements that Bandy now claims led to his conviction because he testified.

**{¶79}** Thus, Bandy cannot demonstrate the requisite prejudice to support his claim without also demonstrating, at a minimum, that trial counsel's decision to have him testify fell below a reasonable standard, and was not a debatable trial strategy that fell within the presumption of reasonable performance afforded trial counsel.

**{¶80}** On this issue, we conclude that Bandy has not met his burden. The record does not contain sufficient facts to ascertain whether Bandy took the stand based upon the advice of trial counsel.

**{¶81}** In sum, Bandy cannot meet the prejudice prong of *Strickland* because there does not exists "a reasonable probability that absent [his attorney's withdrawal of the motion to suppress], the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accordingly, we overrule the fifth assignment of error.

### III. Conclusion

**{¶82}** Because we find no merit to Bandy's five assignments of error, we affirm the trial court's judgment.

Judgment affirmed.

**MOCK, P.J.,** and **MILLER, J.,** concur.

Please note:

The court has recorded its own entry this date.